# EXHIBIT C

Case 1:25-cv-09357-MKV    Document 28-3    Filed 03/27/26    Page 2 of 11

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL2          Horowitz - Cross          Page 692

raise questions about his integrity. We do not believe that Mr. Horowitz disclosed any of these large cash withdrawals to the government prior to trial.

Second, it is evidence of deceptiveness and untruthfulness because seeking to avoid the filing of a currency transaction report with the treasury department is itself evidence of character for untruthfulness, and there are cases so holding.

MR. HARTMAN: Mr. Reisner, can you lower your voice.

MR. REISNER: Third, Mr. Horowitz's lawyers have told the government that some of this money was for drugs. We want to know the amount that was for drugs because it may be inconsistent about the type and frequency of drug purchases and drug use that the witness has disclosed to the government.

To be clear, we will not refer to the personal-conduct issue we have previously discussed with the Court.

THE COURT: I'm sorry. You have been told that Mr. Horowitz's lawyers advised the government that some of this money was used for narcotics.

MR. HARTMAN: Can we confer for just a second?

THE COURT: Sure.

MR. HARTMAN: Judge, first of all, there is no predicate to establish that Mr. Horowitz knew about the filing requirement, which I think would be a requirement to establish structuring. They haven't asked him any questions about that.

LADMCOL2          Horowitz - Cross          Page 693

I don't know what he would say to that question.

Second of all, we don't know whether there was a currency transaction report filed. There is no indication in the proffer of whether there was or wasn't one filed.

Third of all, this is purely speculative with respect to a claim that he was somehow structuring some of these transactions dates apart. I don't know what the rules are that the banks have about cash withdrawals and how that works.

There is just simply not a factual predicate for this, and our view is that it's prejudicial precisely for the reasons that defense argued that we shouldn't be able to bring up evidence about Mr. Cole's personal wealth. Really, all it does is show that Mr. Horowitz is someone who can go to the bank and withdraw $9,000.

THE COURT: The mere fact of having a sufficient amount in your bank account to withdraw large sums is obviously not relevant. However, I think a sufficient proffer has been made, given the amounts that Mr. Horowitz was withdrawing and those amounts in order to avoid the reporting requirements.

Mr. Hartman is also correct, however, that we don't know yet whether in fact Mr. Horowitz knows about the reporting requirements. So you'd have to establish that. But at this point I am not going to preclude further inquiry into the issue.

MR. REISNER: Thank you, your Honor.

LADMCOL2          Horowitz - Cross          Page 694

(In open court)

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

Q. Mr. Horowitz, on October 3, 2014, you withdrew $9,000 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Let's please place before the witness what's marked as Defense Exhibit 2079-D and go to the page with the last three digits 003 and please highlight the October 3 entry.

Q. Does that refresh your recollection that on October 3, 2014, you withdrew $9,000 in cash from your Citibank bank account?

A. It does not.

Q. Are you denying that occurred?

A. I'm not denying that.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, on May 11, 2015, you withdrew $8,000 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 2079-F and scroll to the page that ends with the digits 003 and highlight the May 11 entry.

Q. Does that refresh your recollection that on May 11, 2015, you made a cash withdrawal from your bank in the amount of

LADMCOL2          Horowitz - Cross          Page 695

$8,000?

A. No, it does not.

Q. Do you deny that that occurred?

A. No, I do not.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, on January 26, 2016, you withdrew $8,500 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 2079-J. Can we please scroll to the page that ends with the digits 003 and highlight the January 26 entry.

Q. Does that refresh your recollection that on January 26, 2016, you made a cash withdrawal from your Citibank account of $8,500?

A. No, it does not.

Q. Are you denying that took place?

A. No, I am not.

Q. Mr. Horowitz, in your 36 meetings with the government, between December 2018 and the start of this trial, you didn't tell the government about any large cash withdrawals from your account, correct?

A. Assuming that was the number of meetings, I don't recall us having any discussions or being asked any questions about withdrawals.

**A-241**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 696 |
| --- | --- | --- |

Q. And you claim that some of these cash withdrawals were for keeping cash at home, correct?

A. That is correct.

Q. You claim that your financial adviser at UBS told you to keep cash at home, correct?

A. That is correct.

Q. And your bank accounts are at Citibank, correct?

A. Some of them were at Citibank.

Q. And you have investment accounts at UBS, correct?

A. At the time, yes.

Q. And your testimony is that your financial adviser at UBS advised you to keep large amounts of cash at home rather than at the bank. That's your testimony?

A. My testimony is that our UBS adviser told us to keep cash at home and to make regular withdrawals.

Q. You claim that some of the cash withdrawals were to buy gold, correct?

A. No.

Q. You also claim that some of the money was for drugs, correct?

A. Correct.

Q. How much of the money do you think was for drugs?

A. I don't recall.

Q. What types of drugs?

A. Marijuana.

| LADMCOL2 | Horowitz - Cross | Page 697 |
| --- | --- | --- |

Q. Anything else?

A. No.

Q. Now, Mr. Horowitz, you're aware, and you were aware in 2014 and 2015 and 2016, that if you withdraw $10,000 or more in cash at one time, the bank has to file a report with the treasury department, correct?

A. No.

Q. Your testimony is, you didn't know that the bank was required to file a currency transaction report for withdrawals of over $10,000. That's your testimony.

A. I knew there was some importance to the $10,000 number, but I was not aware of what it was.

Q. You knew there was some significance to the withdrawal of $10,000 or more, correct?

A. That is correct.

Q. And you knew that had to do with federal regulations, correct?

A. No.

Q. You knew that had to do with legal requirements, correct?

A. No.

Q. You knew that had to do with some regulatory requirement, correct?

A. I did not know what it had to do with. I just knew that it was a number that we were supposed to withdraw less than.

Q. On January 17, 2014, did you withdraw $9,000 in cash from

| LADMCOL2 | Horowitz - Cross | Page 698 |
| --- | --- | --- |

the bank with the purpose of keeping that amount under $10,000?

A. I don't recall.

Q. On July 14, 2014 --

    MR. HARTMAN: Objection, your Honor.

    THE COURT: Sustained.

Q. Mr. Horowitz, are you familiar with the term structuring?

A. I'm familiar with the word structuring. I don't know in what reference you are referring to.

Q. Do you know that it's a crime to structure cash transactions in order to avoid triggering the $10,000 reporting requirement?

A. No.

Q. But you knew that $10,000 was the number that you were supposed to keep these cash withdrawals under, correct?

A. That's what I was advised to do.

Q. Now, Mr. Horowitz, you're the type of person who can know what is right and not do it, correct?

A. In general terms, I believe so.

Q. Mr. Horowitz, you feel a thrill when doing something knowingly wrong, correct?

A. No.

    MR. REISNER: Mr. Klein, can we please place before the witness what's been marked as Defense Exhibit 3539-001.

Q. Why don't you take a moment to look at that.

    MR. REISNER: If we can highlight the first line,

| LADMCOL2 | Horowitz - Cross | Page 699 |
| --- | --- | --- |

please.

Q. Mr. Horowitz, that's a handwritten note --

    MR. HARTMAN: Objection.

    THE COURT: Sustained.

Q. Mr. Horowitz, do you recognize that document?

A. I do.

    MR. HARTMAN: Objection.

Q. Is it in your handwriting?

A. I'm sorry.

Q. Is it in your handwriting?

A. Yes, it appears to be in my handwriting.

Q. Did it reflect your thoughts at the time you wrote it?

A. I don't recall.

Q. Let me ask again. Did it reflect your thoughts at the time you wrote it?

    MR. HARTMAN: Objection. Asked and answered.

    THE COURT: Sustained.

Q. Do you dispute that it reflected your thoughts at the time you wrote it?

A. I don't know.

Q. And you wrote it at a time no earlier than October 2015, correct?

A. I believe that is true.

    MR. REISNER: Your Honor, I offer Defense Exhibit 3539-053.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 704 |
| --- | --- | --- |

mind was when this stuff was happening, not just, oh, this is my state of mind at the moment I'm on the witness stand.

MR. REISNER: That's just wrong. DeMaria says exactly that if the remark is something of what the witness was thinking in the present, it's admissible. When he wrote this, this is what he was thinking at the present.

MR. HARTMAN: Judge, in DeMaria, I know this case. It's a guy who is stopped by the cops and he says something extemporaneously about what's going on. The conduct is ongoing when he makes the statement. That's not what this is.

THE COURT: There are, I think, insufficient indicia of the circumstances under which this was made such that, in combination with the arguments from the government, lead me to conclude that it should not come in.

MR. REISNER: Thank you, your Honor.

(Continued on next page)

| LADMCOL2 | | Page 705 |
| --- | --- | --- |

(In open court)

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, testifying falsely about Mr. Cole would advance your goal of fighting back against Mr. Cole that you've been harboring for more than nine years, correct?

A. Not correct.

Q. Your deal with the government protects you from further prosecution in this matter and rewards you for your testimony, correct?

A. I don't believe that it rewards me for my testimony.

MR. REISNER: No further questions at this time, your Honor.

THE COURT: Ladies and gentlemen, we are about ten minutes short of our first break. However, so that everyone can get themselves situated, we will take our first break now. Be prepared to come back at ten minutes after the hour.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

THE WITNESS: Thank you.

THE COURT: Twenty minutes, folks.

(Recess)

THE COURT: Can you bring Mr. Horowitz in, please.

(Jury present)

THE COURT: Ladies and gentlemen, we will now proceed with the redirect examination of Mr. Horowitz.

| LADMCOL2 | Horowitz - Redirect | Page 706 |
| --- | --- | --- |

Mr. Hartman.

MR. HARTMAN: Thank you, your Honor.

REDIRECT EXAMINATION
BY MR. HARTMAN:

Q. Mr. Horowitz, do you remember being asked questions about a letter that you drafted where you referred to fighting back about Mr. Cole?

A. I do.

MR. HARTMAN: Could we put that up, Mr. Charalambous. That's Defense Exhibit 1023-A1.

Q. Mr. Horowitz, you were asked questions about this second or third full paragraph here that begins however.

Do you remember being asked those questions?

A. I do.

Q. Mr. Reisner did not ask you about the first paragraph of this letter, did he?

A. I don't believe that he did.

Q. Can you read the first sentence here.

A. I am completely confused by your directions and actions.

Q. What does it say next to it?

A. Below are just a few examples.

Q. Mr. Horowitz, do you remember what this letter was or why you were drafting it?

A. I believe I was writing a letter to kind of express my feelings and sending it to myself.

| LADMCOL2 | Horowitz - Redirect | Page 707 |
| --- | --- | --- |

Q. Did you ever give it to Mr. Cole?

A. I don't believe so.

Q. Can you read the next paragraph that begins three weeks ago.

A. Three weeks ago, when I was asked to look through the budgeted numbers, and I responded with a $5 million approximate discrepancy and shortfall, you called me into your office and yelled and screamed, if these are the fucking numbers, then go upstairs and start fucking firing people, quote.

I had many take aways from this interaction. No. 1, there are 12 people in the entire department and the entire payroll, including me, of the people on this team is under $2 million annually and, as such, is an absurd comment. 2. I better do something to drive revenue to make up for the accurately depicted shortfall. Then we were discussing hiring someone to do PR and to help in other marketing functions. Again, I was challenged with, quote, finding the 160,000 in revenue to justify the hire. You also recently had me in your office and said, what are you going to do about Ed Hardy? It's a fucking disaster. All three of these instances made it sound as if I better take action and quickly.

Q. Mr. Horowitz, what are you describing here?

A. Interactions that I had with Neil Cole.

Q. Do you recall Mr. Cole saying, what are you going to do about Ed Hardy, it's a fucking disaster?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL4 | Rabin - Direct | Page 812 |
|---|---|---|

regardless of any services that it performed?

A. Yes.

Q. Mr. Rabin, sitting here today, can you think of any consulting work that LF Centennial performed for Iconix?

A. Not LF Centennial, no.

Q. Do you know what LF Centennial is?

A. No.

MR. THOMAS: Mr. Gill, you can remove the exhibit.

Q. Mr. Rabin, I want to turn and talk about SEA-2. You told us a little bit about that as a first amendment to the Southeast Asia joint venture. Could you remind the jury what the business concept of that deal was to be.

A. That we would have the rights for Europe, Korea, and Turkey.

Q. When you say it would have the rights, could you explain?

A. We would expand our business to building the brands in that territory.

Q. In addition to the original Southeast Asia territories, it now adds in which areas?

A. Europe, Turkey -- Europe, Turkey, Korea.

Q. Did you participate directly in those negotiations?

A. Yes.

Q. Who from Iconix did you negotiate with about that deal?

A. Mr. Cole.

MR. THOMAS: Mr. Gill, if we could show the witness

| LADMCOL4 | Rabin - Direct | Page 813 |
|---|---|---|

and the parties Government Exhibit 1040.

Q. Mr. Rabin, do you recognize Government Exhibit 1040?

A. Yes.

MR. THOMAS: The government offers 1040.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1040 received in evidence)

MR. THOMAS: Mr. Gill, if you could publish to the jury.

Q. Mr. Rabin, now that that's up, can you tell us what's reflected here on your screen.

A. I'm asking him if he is free.

Q. You are asking who?

A. Mr. Cole.

Q. Were you and Mr. Cole in direct touch with one another in this time period?

A. Yes.

Q. Do you think that you needed to talk to Mr. Cole's subordinates before talking to him directly?

A. No.

MR. THOMAS: Mr. Gill, let's go to Government Exhibit 1254, for the witness and the parties.

Q. Do you recognize that?

A. Yes.

MR. THOMAS: The government offers 1254.

| LADMCOL4 | Rabin - Direct | Page 814 |
|---|---|---|

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1254 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish.

Q. Mr. Rabin, what are we looking at here?

A. I'm asking Neil if he is free for a call.

Q. Asking who?

A. Mr. Cole.

Q. So is this another occasion of you reaching out to Mr. Cole directly?

A. Yes.

Q. In this message, June 9, 2014, is this a time where you and Mr. Cole were talking about SEA-2?

A. I can't remember.

Q. Is this time period a time period when SEA-2 was being discussed?

A. Yes.

MR. THOMAS: Mr. Gill, you can remove the exhibit.

Q. Mr. Rabin, in the course of your work on SEA-2, did you and your team make any effort to determine what an interest in SEA-2 would be worth to Li & Fung?

A. Yes.

Q. What did you and your team determine?

A. The price would be 10.9 million.

Q. Did you convey that price to Mr. Cole?

| LADMCOL4 | Rabin - Direct | Page 815 |
|---|---|---|

A. Yes.

Q. When you told Mr. Cole that Li & Fung would be willing to pay 10.9 million, did he accept it?

A. Yes.

Q. When Mr. Cole said he accepted 10.9, did you and he ultimately sign a deal at that price?

A. No.

Q. At what price did you ultimately sign a deal?

A. At 15.9 million.

Q. How did the price go from 10.9 to 15.9?

A. Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing.

Q. Mr. Rabin, I want to break it down. What is it that Mr. Cole proposed to you?

A. Raise the price from 10.9 to 15.9., and Li & Fung can bill back Iconix for $5 million.

Q. Is that a proposal that you accepted?

A. Yes.

Q. What happened as a result of you accepting that proposal?

A. We finished the negotiations.

Q. At what price?

A. At 15.9.

Q. Without Mr. Cole's promise to you to permit the billing for marketing, would you have agreed to the increase in the price?

MR. TARLOWE: Objection.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 13, 2021

| LADMCOL4 | Rabin - Direct | Page 820 |
|---|---|---|

A. I'm sorry. Say that again.

Q. Was Rocawear Kids related in any way to the Southeast Asia joint venture?

A. No.

Q. The license holder that was having a shortfall, who was the license holder?

A. Global Brands Group.

Q. Was it the joint venturer?

A. No.

Q. You mentioned discussion about 6 million to cover the shortfall. Could you explain what you were referring to.

A. The purchase price was increased by 6 million to cover a shortfall.

Q. Is that something you discussed with Mr. Cole?

A. Yes.

Q. How did those discussions unfold, to the best of your memory?

A. To the best of my memory, I thought that's how the deal was finalized.

Q. Did you bring up to Mr. Cole the fact of this shortfall and Rocawear Kids?

A. Yes.

Q. When you did, what did he say?

A. I don't remember what he said.

Q. You mentioned the price going up by 6 million. Where did

| LADMCOL4 | Rabin - Direct | Page 821 |
|---|---|---|

that come from?

A. I am not sure if it came from my CFO, Ron Ventricelli, or it came from Iconix group.

Q. Is that something that you discussed with Mr. Cole?

A. Yes.

Q. Did you reach an agreement on that point?

A. Yes.

Q. What was the agreement?

A. That we would pay $6 million to offset the Rocawear shortfall.

Q. Did you understand that to be a firm commitment from Mr. Cole?

A. Yes.

MR. TARLOWE: Objection. Asked and answered.

THE COURT: Overruled.

Q. Mr. Rabin, did you understand that to be a firm commitment?

A. Yes.

Q. Without that commitment, would you have agreed to increase the purchase price by 6 million?

A. No.

MR. TARLOWE: One moment, your Honor.
Nothing further.

THE COURT: Thank you.
We are just a few minutes short of the day, so why don't we stop there. We will convene again tomorrow at 9:30.

| LADMCOL4 | Rabin - Direct | Page 822 |
|---|---|---|

Until then, have a very pleasant evening. Do not discuss the case or read anything about the case or look at anything about the case that you may encounter.

(Jury not present)

THE COURT: Mr. Rabin, you may step down. Any issues either side wants to bring up?

MR. REISNER: I would just ask, your Honor, and we can do this offline with the government. I think it would be useful for all concerned if the government can tell us who their next couple or few witnesses are so we can plan for tomorrow and the rest of the week.

THE COURT: Absolutely. Please do tell them.

MR. HARTMAN: We will do that for sure.

MR. REISNER: Can we know now?

MR. HARTMAN: Sure. We will tell you right now.

THE COURT: It doesn't have to be on the record.

MR. HARTMAN: We will tell them right now.

MR. REISNER: Thank you, your Honor. Thank you, Mr. Hartman.

(Adjourned to October 14, 2021, at 9:00 a.m.)

| | Page 823 |
|---|---|

INDEX OF EXAMINATION

Examination of:                                          Page

SETH HOROWITZ

Cross By Mr. Reisner . . . . . . . . . . . . . . 665

Redirect By Mr. Hartman . . . . . . . . . . . 706

Recross By Mr. Reisner . . . . . . . . . . . . 768

JASON RABIN

Direct By Mr. Thomas . . . . . . . . . . . . . 781

GOVERNMENT EXHIBITS

Exhibit No.                                             Received

1265    . . . . . . . . . . . . . . . . . . . . 727

1255, 1255-A, 1255-B, and 1255-C  . . . . . . 731

1256    . . . . . . . . . . . . . . . . . . . . 735

1517    . . . . . . . . . . . . . . . . . . . . 741

1266    . . . . . . . . . . . . . . . . . . . . 748

200     . . . . . . . . . . . . . . . . . . . . 790

1001    . . . . . . . . . . . . . . . . . . . . 794

208     . . . . . . . . . . . . . . . . . . . . 796

1003    . . . . . . . . . . . . . . . . . . . . 797

1006    . . . . . . . . . . . . . . . . . . . . 798

1008    . . . . . . . . . . . . . . . . . . . . 801

1012    . . . . . . . . . . . . . . . . . . . . 802

1013    . . . . . . . . . . . . . . . . . . . . 804

1014    . . . . . . . . . . . . . . . . . . . . 805

1004    . . . . . . . . . . . . . . . . . . . . 806

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL6 | Rabin - Redirect | Page 977 |
|---|---|---|

A. Yes.

Q. Can we show the witness Government Exhibit 1006. We can publish that to the jury, Mr. Gill. Mr. Gill, why don't you remove that enlargement.

Mr. Rabin, do you recognize this?

A. Yes.

Q. What is it that your team reported back to you in the due diligence process?

A. The findings of the brands, the quality of the brands, the potential of the brands.

Q. And how was the quality of the brands, as compared to what you expected?

A. Not to the same level that I expected.

Q. Do you see under Umbro, No. 1, there's a paragraph beginning "the really disturbing issue"?

Do you see that Mr. Dave Thomas writes to you, "The really disturbing issue is that PWC and CJ have requested from David at Iconix the new agreements, even just term sheets and the comment was, use the existing ones"?

THE COURT: Please show down, Mr. Thomas.

MR. THOMAS: Yes, your Honor.

Q. "It appears, quite obviously, that MGs will come down substantially and Iconix needs to be transparent"?

A. I see that.

Q. What does "MGs" refer to?

| LAEPCOL6 | Rabin - Redirect | Page 978 |
|---|---|---|

A. Minimum guarantees.

Q. What was the significance of that?

A. That the minimum guarantees we use to also potential value the asset.

Q. Mr. Gill, if you could remove the enlargement.

We can move on from this entirely.

Now, Mr. Rabin, do you remember being asked about consulting work?

A. Yes.

Q. In connection with SEA-1, when you said you did consulting work, what were you referring to?

A. The diligence, looking for opportunities, analyzing the business in Southeast Asia, talking to the licensees about what they would require to grow the business, stuff like that.

Q. What was the purpose, from Li & Fung's perspective, of undertaking that work?

A. That -- to my best of my memory, that was something that we did in the beginning to assess the market, to see if there's opportunities to grow the business and to show the Iconix group the opportunities for their brands in that territory.

Q. And after that work, were you and your team able to compute a purchase price you were willing to pay for the interest?

A. Yes.

Q. What was the purchase price?

A. $10 million.

| LAEPCOL6 | Rabin - Redirect | Page 979 |
|---|---|---|

Q. Now, Mr. Rabin, in connection with SEA-1, you also signed a consultancy agreement, right?

A. Yes.

Q. Do you remember that agreement was between Iconix and LF Centennial Limited?

A. Yes.

Q. Did LF Centennial Limited do any of the things you just said or the consulting work that was performed?

A. Not LF Centennial.

Q. Are you aware of any other occasion when Li & Fung or GBG billed a joint venture for consulting work when it was a partner in a joint venture?

A. I don't remember.

Q. Now, on cross-examination you were asked about the notion of goodwill between business partners; do you remember that?

A. Yes.

Q. So I want to separate out what could happen from what did happen. Okay?

A. Okay.

Q. Did you and Mr. Cole strike an agreement with respect to the purchase price for SEA-2?

A. Yes.

Q. What was the agreement?

A. 10 million -- ten-point-something-million dollars.

Q. And after you settled on that purchase price, did you

| LAEPCOL6 | Rabin - Redirect | Page 980 |
|---|---|---|

discuss raising it further?

A. Yes.

Q. What were those discussions?

A. To increase the price by $5 million and have the ability to bill it back in marketing.

Q. Did those discussions result in an actual agreement in front of you?

MR. TARLOWE: Objection, leading.

THE COURT: Overruled.

A. What's the question again? I'm sorry.

Q. What did Mr. Cole say to you, if anything, with respect to the increase in the purchase price for SEA-2?

A. If we increased the price by 5 million, we can bill it back by marketing.

Q. Did you accept that offer?

A. Yes.

Q. Did you understand that you had an agreement with Mr. Cole about that matter?

A. Yes.

Q. Having now looked at a bunch of records with Mr. Tarlowe, do you doubt your memory of that fact?

A. No.

Q. Now, I want to talk about the marketing that results from SEA-2 for a moment. Why is it that GBG billed marketing in the total amount of 5 million to Iconix?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL6 | Rabin - Redirect | Page 981 |

A. That was the agreement I had with Mr. Cole.

Q. From your perspective, was the marketing done worth 5 million precisely?

A. Not a hundred percent 5 million.

Q. Is the marketing work that was undertaken work that GBG would have done anyway?

A. Yes.

Q. You were also asked a bit about the marketing. Right now, can you recall any marketing work precisely that GBG undertook for SEA-2?

A. I wasn't involved with the marketing side of the business.

Q. But, Mr. Rabin, can you think of a single thing that GBG did to market SEA-2?

A. Building brand books.

Q. Now, aside from Iconix, have you ever entered into a deal that involved increasing the purchase price for a commitment to give back money in some other fashion?

A. Not that I'm aware of.

Q. And, Mr. Rabin, with respect to SEA-1, why is it that you agreed to pay an additional 2 million to Iconix?

MR. TARLOWE: Objection, foundation.

THE COURT: Overruled.

A. I was going to get back $2 million.

Q. Did you think you were getting something from the deal too?

A. Yes.

| LAEPCOL6 | Rabin - Recross | Page 982 |

Q. And with respect to SEA-2, why is it that you agreed to increase the purchase price by 5 million?

A. Because I was getting back the $5 million.

Q. And with respect to SEA-3, why did you agree to increase the purchase price by 6?

A. To reduce the Rocawear shortfall.

Q. Now, without Mr. Cole's assurance to send 2 million back to you on SEA-1, would you have agreed to pay him the extra 2?

A. No.

Q. And without Mr. Cole's assurance to send 5 million back as marketing for SEA-2, would you have agreed to increase the purchase price by 5 million?

A. No.

Q. And without Mr. Cole's assurance to send or relieve $6 million in obligations on SEA-3, would you have agreed to increase the purchase price?

A. No.

MR. THOMAS: Nothing further.

THE COURT: Recross?

RECROSS EXAMINATION

BY MR. TARLOWE:

Q. Mr. Rabin, you were just asked about SEA-1, and on SEA-1, there was no commitment to make any payment or do anything that was not in the written agreement, correct?

A. Correct.

| LAEPCOL6 | Rabin - Recross | Page 983 |

Q. All of the parties' commitments were documented in the written agreement, correct?

A. Correct.

Q. And on SEA-2, the written agreements do not contain any obligation on the part of Iconix to pay future marketing money, correct?

A. Correct.

Q. And doesn't that demonstrate that others at GBG did not believe that there was an agreement?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. I don't know.

Q. And on SEA-3, the deal documents did not include any obligation on the part of Iconix to relieve GBG of its royalty obligations, correct?

A. Correct.

Q. And Mr. Cole didn't ask you to keep anything out of any of those agreements, right?

A. Correct.

MR. TARLOWE: Nothing further.

THE COURT: Anything else?

MR. THOMAS: No, your Honor.

THE COURT: Mr. Rabin, you may step down.

(Witness excused)

Will the government please call your next witness?

| LAEPCOL6 | Cuneo - Direct | Page 984 |

MR. SOLOWIEJCZYK: The government calls Peter Cuneo.

THE COURT: Sir, please step all the way forward, and watch your step and avoid the wires on the floor. Please step into the witness box and remain standing.

FRANK PETER CUNEO,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Sir, you may take off your mask in the witness box. Please have a seat. Make yourself comfortable. Pull your seat up to the microphone, and please begin by stating your first and last name and spelling it, first and last name.

THE WITNESS: My name is Frank Cuneo, F-r-a-n-k, C-u-n-e-o.

THE COURT: Mr. Solowiejczyk.

DIRECT EXAMINATION

BY MR. SOLOWIEJCZYK:

Q. Good afternoon, Mr. Cuneo. You said your name was Frank Cuneo. Do you sometimes go by Peter Cuneo?

A. Yes. My second name is Peter Cuneo, and actually, my family has called me Peter since I was born.

Q. What do you currently do for a living?

A. I'm currently an investor and an executive involved in actually numerous activities.

Q. During your career, have you been an executive at publicly

# A-323

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFMCOL2 | Margolis - Direct | Page 1113 |
| --- | --- | --- |

Do you see that?

A. I do.

Q. Are these revised drafts of the agreement being sent over?

A. I believe so.

MR. SOLOWIEJCZYK: If we can look at page 8, Mr. Charalambous.

Q. Are you familiar with the term red line, Mr. Margolis?

A. I am.

Q. Is this a red line, essentially, what we are looking at here?

A. It is.

Q. Showing changes against a prior draft?

A. Yes, sir.

Q. Just looking at the top, including the header, these revisions are dated June 25, is that right?

A. Yes, sir.

Q. The quarter is going to end at the end of June, right?

A. It is.

MR. SOLOWIEJCZYK: If we could go down to the paragraph that starts with Iconix and LF acknowledge.

Q. We looked at this paragraph a couple of minutes ago, right?

A. Yes, sir.

Q. Now, certain changes have been made?

A. They have.

Q. The fair market value went up from 21,835,000 to

| LAFMCOL2 | Margolis - Direct | Page 1114 |
| --- | --- | --- |

31,835,000?

A. That's right.

Q. The 50 percent share that LF was going to be getting, instead of paying 10.9 million, now you were going to be paying 15.9 million, is that right?

A. Yes, sir.

Q. Mr. Margolis, at the time did you actually believe the fair market value was worth 31.8 million instead of 21.8 million?

A. No, sir.

Q. Did you think that the interest that LF Asia was going to be buying was worth 15.9 million instead of 10.9 million?

A. I did not.

Q. And LF Asia ended up paying 15.9 million, right?

A. We did.

Q. Five million more, is that correct?

A. Yes, sir.

Q. Between the original agreement we saw and this revised version, was there any change in the terms of what assets LF Asia actually was going to be purchasing an interest in?

A. No, sir.

Q. Had you decided that the assets were actually worth more money?

A. No, sir.

Q. Mr. Margolis, fair to say you were one of the principal people involved in negotiating the SEA-2 transaction, right?

| LAFMCOL2 | Margolis - Direct | Page 1115 |
| --- | --- | --- |

A. I was.

Q. Let me ask you simply, Mr. Margolis, why did the price increase by $5 million?

MR. TARLOWE: Objection. Foundation.

THE COURT: Overruled.

A. Because we were going to get the money back.

Q. Who were you going to get the money back from?

A. From Iconix.

Q. And the return of that $5 million, Mr. Margolis, was it your understanding at the time that you had a firm commitment from Iconix they would return that money?

MR. TARLOWE: Objection. Foundation.

THE COURT: Overruled.

Q. You can answer.

A. That was my understanding.

Q. Would GBG have been willing to pay $15.9 million if there not been that firm commitment from Iconix to return $5 million?

A. No.

Q. Now, this agreement that LF Asia/GBG was going to pay $5 million more in return for later getting that $5 million back, was it written down in the contracts, to the best of your knowledge?

A. It wasn't.

Q. Was it an oral agreement?

A. I believe so.

| LAFMCOL2 | Margolis - Direct | Page 1116 |
| --- | --- | --- |

MR. SOLOWIEJCZYK: You can take that down.

Mr. Charalambous, if you could just quickly put up Defense Exhibit 1233-A1, which I believe is in evidence.

THE COURT: Before we do that, it is time for our second break. Do be prepared to come back in 20 minutes. Don't discuss the case.

(Jury not present)

THE COURT: Mr. Margolis, you may step down. I actually miscalculated. Ms. Rivera tells me that the jury has already begun chirping.

(Recess)

(Continued on next page)

# A-325

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1121 |
|---|---|---|

Q. Who did he report to?
A. To me.
Q. Was he related to Neil Cole, by the way?
A. No, sir.
Q. Okay. So they just happen to have the same last name?
A. Yes.
Q. So the subject line of this e-mail is China Umbro and LC. What's that referring to?
A. To Lee Cooper.
Q. And the Umbro piece, what's that?
A. That's the other brand.
Q. Are these both Iconix brands?
A. They were.
Q. And were you, at this point, having discussions with Mr. Horowitz about amending the Southeast Asia joint venture for the region of China?
A. Yes, sir.
Q. With respect to the Umbro and Lee Cooper brands?
A. Yes, sir.
Q. Okay. So here, Mr. Horowitz says, "Jared, attached is a term sheet that should reflect our most recent conversation. The purchase price went up to 15.5, from 15 for reasons that I can explain." Do you see that?
A. I do.
Q. If we look at page 2, so this says, "It's a possible China

| LAFPCOL3 | Margolis - Direct | Page 1122 |
|---|---|---|

   JV for Umbro and Lee Cooper," right?
A. Yes, sir.
Q. July 28th is the date?
A. Yes.
Q. This is just a proposal, correct?
A. That's correct.
Q. So under this proposal, if you look at the purchase terms, what's being proposed is that LF Asia is going to pay, as a purchase price for this amendment, that would cover China for Umbro and Lee Cooper, and I should say Hong Kong, Makau and Taiwan, as well?
A. 15.5 million.
Q. Now, Mr. Margolis, did the SEA-3 transaction end up closing at 15.5 million?
A. No.
Q. Did it close at a higher number?
A. It did.
Q. And we'll get to this in a few minutes, Mr. Margolis, but did GBG end up paying 21.5 million instead?
A. Yes, sir.
Q. And why did GBG pay $6 million more?
   MR. TARLOWE: Objection, foundation.
   THE COURT: Overruled.
A. Because we were going to get the money back.
Q. From who?

| LAFPCOL3 | Margolis - Direct | Page 1123 |
|---|---|---|

A. From Iconix.
Q. All right. Mr. Margolis, I want to go back to talking about SEA-2. So SEA-2 closed at 15.9 million end of June. What were you expecting was supposed to happen next, after that? Was there anything you were expecting?
A. I don't understand the question, I'm sorry.
Q. Sure. I'll rephrase it.
   I think you testified before the break that you paid $5 million more than you had originally thought you would and that there was a commitment from Iconix to give 5 million back to GBG, right?
A. Yes, sir.
Q. So what needed to happen next?
A. We had to send them invoices.
Q. Did you expect to get the money back?
A. Yes, sir.
Q. Okay. Now, this arrangement with respect to -- that you paid $5 million more with a firm commitment to get the $5 million back from Iconix, did you have conversations with Ethan Cole about that arrangement?
A. I did.
   MR. TARLOWE: Objection.
   THE COURT: Overruled.
Q. Did you make him aware of what the deal was?
   MR. TARLOWE: Objection.

| LAFPCOL3 | Margolis - Direct | Page 1124 |
|---|---|---|

   THE COURT: Overruled.
A. Can you please repeat the question?
Q. Did you make him aware of the fact that LF Asia had overpaid by 5 million and expected to get the 5 million back from Iconix?
A. I believe so.
Q. Just for the witness and the parties, could you put up Government Exhibit 1068.
   I'm going to show you the first page, Mr. Margolis. Could you just take a look at that. Do you recognize this document?
A. Yes, sir.
Q. What is it?
A. It's an e-mail from Ethan Cole to myself that was dated on August 28th, 2014.
Q. And if you could look at the second page, quickly. Do you recognize that as well?
A. Yes, sir.
Q. Okay.
   MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1068.
   MR. TARLOWE: Objection, hearsay.
   THE COURT: Sustained.
   MR. SOLOWIEJCZYK: Your Honor, may we have a sidebar?
   THE COURT: Sure.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 20, 2021

---

LAKPCOL2          Margolis - Redirect          Page 1539

random numbers, but they still added up to 5 million; is that right?

A. Correct.

Q. And you were asked some questions on cross-examination, and you were shown round-number invoices for other business partners; do you remember that?

A. Sorry, can you please repeat it?

Q. You were shown invoices that ended in zeroes with various other --

A. Yes.

Q. -- business partners; do you remember that?

A. Yes.

Q. Now, to your knowledge, were any of those invoices subsequently revised to make the numbers appear more random?

A. Not that I'm aware of.

Q. And, Mr. Margolis, Iconix and GBG, they were joint venture partners, right?

A. Correct.

Q. If GBG had not overpaid by 5 million on SEA-2, would GBG have even billed Iconix for this $5 million in marketing?

A. No.

Q. Mr. Margolis, yesterday you were asked if you could recall a specific conversation at a specific moment with Jason Rabin about the overpayments, and you said you couldn't; do you remember that?

---

LAKPCOL2          Margolis - Redirect          Page 1540

A. Can you please repeat it?

Q. Yesterday, Mr. Tarlowe was asking you if you could remember a specific conversation at a specific moment with Jason Rabin about the SEA-2 overpayments; do you remember that?

A. Yes.

Q. Okay. Now, Mr. Margolis, you started to say something about what Jason Rabin told you, and then Mr. Tarlowe, he didn't let you finish; do you remember that?

A. I do.

Q. Now, Mr. Margolis, even if you don't remember the precise circumstances, did you have a conversation with Jason Rabin about the fact that GBG was overpaying by $5 million on SEA-2?

A. I did.

Q. And did you have a conversation with Jason Rabin about the fact that GBG would be no worse off because Iconix would return that 5 million?

A. Yes.

Q. Mr. Margolis, I'm almost done. I just have a couple more questions. I want to talk briefly about SEA-3.

And, Mr. Charalambous, if you could put up Government Exhibit 1139, and if you could just focus on the top half, yes, with the e-mail header, please. Thanks.

So, Mr. Margolis, you remember seeing this, right?

A. I do.

Q. And I believe you testified on direct that this was

---

LAKPCOL2          Margolis - Redirect          Page 1541

prepared by Ethan Cole for you at your direction, correct?

A. Correct.

Q. That was in advance of a December 2nd meeting between you, Neil Cole and Jason Rabin, correct?

A. Correct.

Q. And this e-mail, it's just between you and Ethan Cole. There's no one else on it; is that right?

A. That's right.

Q. And the overpayments and the givebacks, those weren't a secret from Ethan Cole; you had told him about them, right?

A. Yes.

Q. Now, in the chart above, I'm looking at the LC/Umbro column, Mr. Margolis, it says the purchase price was 21.5 million, correct?

A. Correct.

Q. And then it says 15.5 million was the value based on rev multiple; do you see that?

A. I do.

Q. And then it says that the plug was 6 million, right?

A. Correct.

Q. And I believe you testified on direct the "plug" was an overpayment; is that right?

A. Correct.

Q. And that 6 million, am I correct, that it's the difference between the purchase price and the value based on rev multiple?

---

LAKPCOL2          Margolis - Recross          Page 1542

A. Correct.

Q. If we go down to the third bullet point, it says the "6 million for China Umbro/LC will be offset the following;" do you see that?

A. I do.

Q. Mr. Margolis, were you expecting Iconix to return that $6 million overpayment on SEA-3 to GBG?

A. Yes.

MR. SOLOWIEJCZYK: Nothing further.

THE COURT: Mr. Tarlowe, anything further?

MR. TARLOWE: Just briefly, your Honor.

RECROSS EXAMINATION

BY MR. TARLOWE:

Q. Mr. Margolis, you were just asked whether GBG would have been willing to pay $15.9 million for SEA-2 if there hadn't been a commitment to get the money back; do you recall that?

A. Correct.

Q. And you said GBG would not have been willing to do that?

A. Based on my understanding.

Q. But you don't know why the investment committee decided to pay $15.9 million, correct?

A. Yes, I wasn't part of those conversations.

Q. So you don't know whether the investment committee would have authorized -- well, withdrawn.

Your understanding is that the investment committee

---