EXHIBIT D

**A-892**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Cross | Page 1325 |
|---|---|---|

none of which was produced, this was produced because it mentioned Neil Cole. So we are not randomly fishing. But, if the Court reviews it, it doesn't say anything about cigarettes. They are making a representation about what the witness would say but we don't have to accept that representation.

THE COURT: When was this written?

MR. HECKER: We don't know. It is undated. The reason it was produced, I suspect, is because it makes reference to the Neil Cole chaos. It's his handwritten notes of what he was thinking and feeling in his private moments that's contemporaneous with the time period we are talking about.

THE COURT: That's the point. Is it? It could have been written, I don't know, years later.

MR. HECKER: No. I mean I -- no one has represented that.

MR. LENOW: Yes.

MR. HECKER: I don't have the diary so I don't know whether there are other pages of the diary that would help put this at a moment in time. It is clearly printed out from a book, they haven't given us the whole thing but they may know what came right before and what came right after and what time period it was.

MR. LENOW: Judge, this was all expressly discussed at side bar last time. We did -- I don't have it in front of me

| MBA5col1 | Horowitz - Cross | Page 1326 |
|---|---|---|

now but we did make a representation when it was produced that this was written no earlier than months after Mr. Horowitz left Iconix, months after the events at issue, and that was one of the reasons why your Honor said this is not fair game. And the reference to a mention of cigarettes, there was another topic that I don't want to put on the record that your Honor explicitly precluded reference to in this trial, that's doing things knowingly wrong, cigarettes, what are the notes that we produced from Mr. Horowitz' proffers he said that refers to smoking cigarettes and that other matter that your Honor said was out of bounds.

So, this doesn't refer to this at all. Your Honor said no last time, there is no reason to change the ruling this time.

MR. HECKER: Just to be really clear, we are not required to accept what this witness told you when you asked him about it when you were trying to understand what it relates to. I have no intention of going into anything about any personal -- the issue that was excluded, I don't even want to say it at side bar but we both know what we are talking about. I have no intention of going into it. The important thing, your Honor, is it describes a state of mind and a way of behaving when he feels out of control, like the moment we are in now and I think I am entitled to explore that with the jury.

MR. THOMAS: Your Honor, may we be heard once more on

| MBA5col1 | Horowitz - Cross | Page 1327 |
|---|---|---|

this topic?

MR. HECKER: I'm getting tag teamed here.

MR. THOMAS: First of all, the burden is on Mr. Hecker to lay the predicate that it is admissible as extrinsic proof, so the fact that he doesn't know is itself an argument against admission, but second, we are talking here about naked character evidence. The description that Mr. Hecker has provided about how the witness feels about his own conduct invites the jury to infer from his reasoning a propensity for misconduct. That is expressly what the rules forbid and this issue is collateral, they ought not be able to prove it up with the extrinsic record.

MR. HECKER: Your Honor, there are two things that are really important. First of all, I was in the middle of laying foundation for impeachment if he continued to deny that this is how he felt and acted at times like this. It goes entirely to his demeanor in front of the jury. I mean, it is relevant to understanding his propensity for being truthful or untruthful including that he is denying that that's how he felt.

THE COURT: But the problem with this document is it is out of context, temporally. We don't know where it comes from, we don't know what is before, what comes after, and because of that there is a danger -- and again, I'm going back to 403 -- that the jury -- because you won't be able to put it in its proper context -- will have a very skewed view of

| MBA5col1 | Horowitz - Cross | Page 1328 |
|---|---|---|

Mr. Horowitz based on this document which I think would be unfair.

We have had a day and a half or more of cross-examination of Mr. Horowitz, I think he has been impeached in any number of ways, so I'm not going to allow you to put this document in.

MR. HECKER: Can I just ask just for a representation from the government that they have looked at this notebook and looked at the days that come before it and after it to actually confirm that this happened after his time at Iconix? Because we have no way assessing that. This was produced to us as a single page that Mr. Horowitz gave to counsel and I think the only reason was because there is a stray reference to Mr. Cole among a litany of other stressful and family things that he was going through.

THE COURT: What is "J surgery"?

MR. MARKUS: His daughter.

MR. LENOW: I think it is a family member's surgery.

MR. HECKER: Which was in 2015, and the government has just effectively told us that they didn't get the notebook, they just took a page that was produced by his lawyer and didn't make any attempt to look through the diary. We don't know what else is in there and whether there are diary entries taken during the time period he was there. I don't know, we are definitely boxed out by not knowing, but it was a situation

**A-893**

UNITED STATES OF AMERICA, v.
NEIL COLE,
<span style="float:right">November 10, 2022</span>

| MBA5col1 | Horowitz - Cross | Page 1329 |
|---|---|---|

created by the government.

THE COURT: It may be, but I am not going to allow you to use this document.

MR. HECKER: OK.

| MBA5col1 | Horowitz - Cross | Page 1330 |
|---|---|---|

(In open court)

BY MR. HECKER:

Q. Now, sir, after you left Iconix, the next significant employment you had was at Baked by Melissa; is that true?

A. That is true.

Q. And Baked by Melissa was founded by a woman named Melissa Ben-Ishay? Is that true?

A. Melissa Ben-Ishay.

Q. Melissa Ben-Ishay. Is that how you pronounce it?

A. That's how she pronounces it.

Q. Ms. Ben-Ishay founded the company and initially had entrusted her brother to be the CEO of that company before you joined; is that true?

A. Yes, that's true.

Q. You replaced her brother as CEO of the company, yes?

A. Yes. That is true.

Q. And you joined the company in 2016; is that true?

A. I believe that is true.

Q. You became CEO in 2016, yes?

A. I believe that timing is correct.

Q. And the government, on direct examination, said to you: And when you started working at Baked by Melissa, did you tell your new employer that you had engaged in fraud at Iconix? And you said: No. And they asked you why not. And you said it was because you were trying to get a job and it wasn't public

| MBA5col1 | Horowitz - Cross | Page 1331 |
|---|---|---|

knowledge that you had engaged in any fraud, correct?

A. That is all correct.

Q. But in fact, sir, it is not surprising that you didn't tell her that you had engaged in a fraud because at that point, in 2016, that's what you were telling everybody, that you had not engaged in a fraud; correct?

A. I don't know if that's correct.

Q. Well, we have established that when you left you, through counsel, represented to the special committee of Iconix that you hadn't committed a crime, correct?

A. I don't know if we established that.

Q. You hadn't had a single meeting with any government regulator in which you suggested that you had done something wrong during your time at Iconix as of time you took this job, correct?

A. That sounds correct.

Q. Right. So you wouldn't tell Ms. Ben-Ishay, who has just entrusted you with running the company that she built, with information that you weren't even sharing with any government enforcement authorities, right, about your role at Iconix?

A. That's correct.

Q. Now, sir, while you were CEO you were the senior-most executive, yes?

A. That is correct.

Q. Ms. Ben-Ishay continued to be very actively involved in the

| MBA5col1 | Horowitz - Cross | Page 1332 |
|---|---|---|

company that she founded, yes?

A. Yes. I believe I promoted her to president.

Q. You promoted her to president. She was one of the significant shareholders of the company, yes?

A. Yes.

Q. I mean, she could hire you and she could fire you, right?

A. I believe so.

Q. She was your boss even if you were the one that promoted her to president, yes?

A. I don't recall exactly how that operating agreement worked but to some extent, yes. I mean -- to some extent.

Q. As the CEO of the company, the senior management, you owed duties to the owners of the company, correct?

A. Yes.

Q. You understood you owed fiduciary duties to the company, yes?

A. Yes.

Q. You are supposed to tell them everything that would be important to them to know, yes?

A. I believe that's fair.

Q. Now, at some point Ms. Ben-Ishay took leave, took maternity leave; is that true?

A. That is true.

Q. And so she was gone for chunks of 2018, right?

A. I believe that timing is correct. I'm not sure if it was

# A-1038

UNITED STATES OF AMERICA V
NEIL COLE,                                                                    November 18, 2022

| MBi5col1 | Cole - Direct | Page 2437 |
|---|---|---|

Q. And you see that it states there: In the interim, we are working with GBG with a goal of closing end of August. I have not mentioned the Rocawear Kids component until we agree it is the right move.

Do you see that language there?

A. I do.

Q. What was your understanding of what Mr. Horowitz meant when he referred to the Rocawear Kids component?

A. I don't -- you know, I know at the time they wanted to get out of Rocawear so, you know, I don't know whether he was considering that or could be together. But, I don't know what he was thinking.

Q. Were they components of the same thing, the SEA-3 transaction and the efforts to get GBG out of the Rocawear licensing agreement, were those part of the same thing in your mind at the time?

A. No. They were separate initiatives but GBG wanted both so -- but they were, ended up -- they were not linked.

MS. DABBS: If we can pull up Government Exhibit 1058 which is in evidence as well? This is a string of e-mails and maybe we can page forward so that Mr. Cole has a chance to see where it begins.

Q. Do you see it appears this is an e-mail string that begins on August 13th, and then if we scroll up it appears to be forwarded to you or sent to you by Mr. Horowitz and you then

| MBi5col1 | Cole - Direct | Page 2438 |
|---|---|---|

respond to Mr. Horowitz's e-mail?

Do you see that, Mr. Cole?

A. I do.

Q. In your e-mail at the top I just want to direct your attention to that. You state: Let's discuss tomorrow. Will be tough to do China without Roc Kids.

What did you mean by that, Mr. Cole?

A. It was my understanding that GBG wanted to do China and they also wanted to get out of Roc Kids, so to do these two deals at the same time I thought could be difficult. Or tough.

Q. Mr. Cole, did you mean that it would be difficult to do the SEA-3 transaction without a commitment to relieve GBG of its Rocawear licensing agreement obligations?

A. Possibly. I know that they wanted to get out. I know that we weren't going to get them out unless they found it but I do not believe it was part of the same transaction.

Q. Did you make a commitment to GBG that they would get out of the Rocawear Kids licensing agreement?

A. Absolutely not. We never did it and they paid.

MS. DABBS: We can take that down, Mr. Lam.

Q. Now, later in 2014, Mr. Cole, did you authorize Iconix to pay marketing invoices from GBG that totaled approximately $5.4 million?

A. I did.

Q. Did you believe at the time that you authorized payment on

| MBi5col1 | Cole - Direct | Page 2439 |
|---|---|---|

those invoices that Iconix had an obligation to make those payments?

A. Absolutely not.

Q. If Iconix didn't have an obligation to make those payments, why did you authorize them?

A. GBG was our largest client, I believe it was, like, 11 percent of the business, they brought in over 50 million of royalty and we had about, I think, 18 or 19 agreements with them and we were working on a lot more and I felt a little bad that we decided not to go forward with Lee Cooper, or they -- I never got the pressure so I never had to deal with it but I knew they wanted it. I also was -- felt bad that we never found a replacement for Rocawear. Also, they were having troubles in Korea where London Fog they thought was worth a lot more and it ended up being worth a little less. So, a lot of whining, and Mr. Horowitz was advocating to give them $5 million throughout the fall so I finally -- I had it in my budget, the company had a $36 million budget and we only spent around 32 or thirty-some-odd, so I decided, as I have done other times in the past, I gave them a chargeback or marketing for, it ended up being $5.4 million.

Q. Was it surprising to you that GBG was asking for marketing payments at this time?

A. No, they were always asking which was always uncomfortable so -- but, you know, we had given them marketing payments

| MBi5col1 | Cole - Direct | Page 2440 |
|---|---|---|

before on Peanuts and, you know, they were -- it is kind of what Jason did. It was known in the market with all the license -- all the companies that he was always looking for concessions or whether it be marketing money or other monies for his company.

Q. And what, if any understanding, did you have at the time about marketing work that had been done or was being done by GBG?

A. I knew TLC very well because they were my partner and I liked and respected Angela, and Melvin, and Simon Bamber was a part of that group, they had a big marketing team, a beautiful office, and Angela would tell me that the marketing people in New York don't understand Europe, that Europe is high-end and European people don't like American brands. So, she wanted to become a marketer for Iconix in all parts of the world that she thought were cool or more European-type so -- and I respected her work, she did good work through the years, and so I was comfortable with TLC or now GBG doing work with us because GBG had bought TLC right in between SEA-1 and SEA-2 so we inherited GBG as a partner when they bought TLC because TLC was our prior partner.

Q. And what connection, if any, was there in your mind between the SEA-2 transaction and the marketing invoices that you authorized payment on in the fall of 2014?

A. Absolutely none.

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

| MBi5col1 | Cole - Cross | Page 2469 |
|---|---|---|

knew of anyone, except what Mr. Horowitz has alleged.

Q. So, Mr. Cole, I want to be clear about it. You are saying it is possible there was a secret side deal for SEA-2?

A. No.

Q. So you know, for certain, there were no side agreements with SEA-2?

A. Correct.

Q. You were involved enough in the negotiations to know that fact?

A. Yes. I signed the documents.

Q. Now, yesterday Ms. Dabbs asked you what commitments or obligations, if any, did Iconix undertake in connection with that transaction were not written in the transaction documents. Do you remember that question?

A. Correct.

Q. And you said absolutely none?

A. Correct.

Q. I want to be clear again. Are you saying there is no promise of any kind or just that promise wasn't in writing?

A. The agreement, everything was in the agreement.

Q. So, sir, let me ask you again. Are you saying there was no side promise of any kind or just the promise wasn't in the agreement?

A. I don't understand the question.

Q. Sir --

| MBi5col1 | Cole - Cross | Page 2470 |
|---|---|---|

A. I think it is a trick question. Can you say it again?

Q. When you say there is no commitment or obligation --

A. That wasn't in the agreement.

Q. Are you referring to a commitment or obligation that you believe could be enforceable in a court or are you saying there is no commitment of any kind, even a handshake deal?

A. There was no commitment because -- in the agreement.

Q. So, I'm going to ask you some similar questions about SEA-3.

A. Sure.

Q. For SEA-3, are you saying nobody at Iconix agreed to a side deal or just that you didn't know about it?

A. I have sat here and heard Iconix -- Iconix -- I have heard Horowitz, or Seth, saying he agreed he thought there was a side deal but I don't think he understood business, that it was signed, and it wasn't agreed to.

Q. Sir, I am asking about your memory at the time the transactions happened.

A. There was absolutely no side deals, everything was in the agreement.

Q. And you know that from your own participation?

A. Yes. I was the CEO and I was the signatory.

Q. And yesterday Ms. Dabbs asked you, again, what commitments or obligations, if any, did Iconix undertake in connection with the SEA-3 transaction that were not written in the transaction

| MBi5col1 | Cole - Cross | Page 2471 |
|---|---|---|

documents. Do you remember that question?

A. Yes. There were none.

Q. And you said none. And the jury, should the jury understand that that means that there is not going to be an unenforceable promise that was on the side?

A. Not from myself; and I was running the company and I signed the agreements.

Q. Is it possible that Mr. Horowitz made that promise?

A. I don't think Mr. Horowitz had the authority to do that promise.

Q. Mr. Horowitz, the COO, didn't have authority to bind the company?

A. No. Not for $13 million, whatever the amount of money it was. You know, especially he didn't tell the board, he didn't tell the CFO, he didn't tell anybody. He had absolutely no authority to do that.

Q. Sir, again, I want to make sure I understand. Are you saying that there was no criminal side deal or just you didn't know about it?

A. There was no criminal side deal and there was no -- and I didn't know about it because I was the CEO and signatory of the agreements.

Q. I want to turn to the prices for a second.

MR. THOMAS: Let's show the witness Government Exhibit 1044 and if we can go to page 8. And Mr. Bianco if we can

| MBi5col1 | Cole - Cross | Page 2472 |
|---|---|---|

enlarge the second paragraph?

A. Is this SEA-1 or 2?

Q. Sir, you can see the numbers reflected here in that paragraph that is enlarged before you, right?

A. Can you give me a minute to read it?

Q. Go right ahead.

A. Thank you. Got it.

Q. And you see this is a blackline, right?

A. Looks like a blueline or redline. Not black, redline.

Q. This reflects changes over a prior draft, right?

A. Yes.

Q. And you can see that what has changed in this paragraph is the price, right?

A. Yes.

Q. And the price here increases by $5 million as compared to the prior draft, right?

A. No, it looks like 10. Oh I see -- the first the fair market is 10 and then the -- down below is 5. Yes, I see it.

Q. Sir, you recognize that $15.9 million price to be the price that SEA-2 closed at, right?

A. Correct.

Q. Sir, why did the price go up by $5 million?

A. I don't know exactly. Mr. Horowitz sent me a letter and told me he negotiated 15.9.

Q. You don't know why it went up?

Min-U-Script®          Southern District Court Reporters          (14) Pages 2469 - 2472

# A-1054

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

| MBIYCOL2      Cole - Direct      Page 2501 |
| --- |

MR. THOMAS: Let's put up, just for demonstrative purposes, Government Exhibit 3048.

Q. Mr. Cole, you recognize this; right?

A. I do. I believe we used it somewhere, maybe in opening.

Q. Your attorneys put this up for the jury right at the start of the case?

A. Yes.

Q. Now, Mr. Cole, would you agree this chart is misleading. Right?

A. I don't know. Tell me why.

Q. You don't know whether the chart is misleading or not?

A. No.

Q. Mr. Cole, it could be that the chart is misleading?

A. You'd have to explain it to me. I don't understand what you're saying.

Q. Let's do it this way. The label on this chart says: "Iconix Annual Revenue Versus Alleged Overpayments." Is that right?

A. Yes.

Q. It has this really big red oval for CAA; right?

A. Yes.

Q. It has 1.15 billion there.

A. That was the purchase price we were negotiating.

Q. Exactly. It wasn't revenue. Right?

A. No. I think revenue was like 7- 800 million.

| MBIYCOL2      Cole - Direct      Page 2502 |
| --- |

Q. Mr. Cole, this chart shows CAA as 1.15 billion. Right?

A. Yes. That was the deal price.

Q. And that's not revenue.

A. No.

Q. And that's not revenue compared to alleged overpayments; right?

A. The deal was 1.15. I don't know how, but okay.

Q. In fact, if this chart reflected the revenue from CAA, there would be no bubble for CAA. Right?

A. No. It would be about 7- 800 million was the CAA revenue.

Q. Well, sir, the CAA never closed; right?

A. No. It never closed.

Q. The company reported zero dollars associated with CAA in its quarterly filing in the second quarter of 2014? Right?

A. Correct. The deal never closed.

Q. And the company reported zero dollars in revenue associated with the CAA deal in the third quarter of 2014; right?

A. Zero revenue ever. We never closed the deal.

Q. And zero dollars for the full year 2014 too. Right?

A. Correct.

Q. So I want to stick with CAA for a moment.

The reason that you talked about CAA on direct is because you wanted the jury to think you were distracted by that deal while this all happened. Right?

MS. DABBS: Objection.

| MBIYCOL2      Cole - Direct      Page 2503 |
| --- |

THE COURT: Overruled.

THE WITNESS: I spent a lot of time on CAA. And it was -- they had 6,000 employees. It was a new and unique model for us. So it was a tremendous amount of our time and my focus because I thought it would be transformative.

BY MR. THOMAS:

Q. Well, it's for that reason I want to be very clear what we're talking about.

Are you suggesting it's possible you were distracted by CAA while a side deal occurred?

A. I wasn't distracted. It's where I was putting my focus. I thought it was good for the company. The SEA deals we had already done seven, eight, nine, ten of them. And it was kind of boilerplate I thought, and Seth was working with them.

I'm not sure how one has anything to do with the other, but I wasn't an active participant where I was incredibly active, thinking that the CAA transaction -- there were millions of documents. It was a crazy endeavor for our company because we never did anything like it. So it was a lot of learning.

Q. Mr. Cole, I want to be clear.

Are you suggesting there could have been a secret side deal while you were focused on all the paperwork about CAA?

A. There was never a secret side deal. Everything was in the agreement. So that's not how we did business.

| MBIYCOL2      Cole - Direct      Page 2504 |
| --- |

Q. You even though you were focused on CAA, you knew enough about the deal to know there's no secret side deal.

A. Correct. I know enough about the company, and I know enough about how we do business and just how business works.

MR. THOMAS: Let's take this down, Mr. Bianco.

Q. When you worked on CAA, there were proposed term sheets -- right? -- from time to time?

A. I believe so.

Q. And proposed letters of intent; right?

A. Yes.

Q. And one of the proposals contemplated that Iconix would pay to participate in the deal through a mix of cash and stock. Right?

A. I don't recall.

Q. In all that time you worked on the deal, you don't remember how you would pay for it?

A. The deal never closed, and it's been eight years/nine years.

MR. THOMAS: Let's show the witness Government Exhibit 3052.

Q. Sir, do you recognize this to be one of the term sheets?

A. Okay.

Q. That's a question, sir.

Do you recognize it?

A. I don't recognize the document. I don't think you could

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

| MBi5col3 | Cole - Cross | Page 2589 |
|---|---|---|

(In open court)

BY MR. THOMAS:

Q. Mr. Cole, to direct your attention to the first sentence of this message, I would ask you just to read that to yourself and look up when you are done.

A. I already read it.

Q. Mr. Cole, does this refresh your recollection that you compared the situation to being treated like it was Soviet Russia?

A. Yes.

Q. You can take down that exhibit.

Now, Mr. Cole, we had spoken earlier about Mr. Rabin, Mr. Horowitz, and Mr. Margolis. I want to talk about some of the other witnesses briefly.

Mr. Cole, is it your opinion that Jason Schaefer gave false testimony today?

MS. DABBS: Objection.

THE COURT: Overruled.

BY MR. THOMAS:

Q. False testimony in this proceeding?

A. Not that I noticed.

Q. Ericka Alford?

A. No.

Q. So, just to make sure that I understand, the people in this proceeding that you think that gave false testimony are

| MBi5col3 | Cole - Cross | Page 2590 |
|---|---|---|

Mr. Margolis?

A. Yes. It's the three people that you threatened.

Q. Everyone else was telling the truth?

A. Pretty much. I didn't see any issues just except those people that you have met with a hundred times and threatened.

Q. Those are the three people who worked on SEA-2 with you, right?

A. Which three people?

Q. Mr. Horowitz, your COO, he worked on SEA-2, right?

A. Yes, he worked on it with Mr. Margolis.

Q. Mr. Rabin, right?

A. He was involved in that, yes.

Q. He is your personal friend?

A. He is a friend, yes. Was a friend. Was a friend.

Q. And Mr. Margolis, he worked for Mr. Rabin?

A. Correct.

Q. And they all worked on SEA-2, right?

A. Correct.

Q. And SEA-3?

A. I don't think Mr. Rabin worked on SEA-3 but those two definitely did.

Q. Mr. Rabin signed off on the deal, right?

A. He did.

Q. And they all say there was an overpay in both of those deals.

| MBi5col3 | Cole - Redirect | Page 2591 |
|---|---|---|

A. Yes. After 50 meetings, five years, and being threatened to be indicted or put in prison.

Q. They all say there was an overpay for those two deals, right?

A. Correct, because you gave them immunity.

Q. They all say there was an overpay for those two deals, right?

A. They believed that after being threatened and after meeting a hundred times with the government.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. DABBS:

Q. Mr. Cole, Mr. Thomas was just asking you some questions about your perspectives on testimony of various witnesses in this trial. Do you recall those questions?

A. I do.

Q. Did you hear Mr. Rabin testify that there was no overpayment on SEA-2 and SEA-3?

A. Mr. Rabin, I don't think remembered anything. He often checked -- you know, if you look it up, he kept changing his testimony and I think he didn't remember a lot so I don't remember -- I hate to not remember what he didn't remember but Mr. Rabin was all over the board.

Q. Mr. Cole, there were some questions at the start of

| MBi5col3 | Cole - Redirect | Page 2592 |
|---|---|---|

Mr. Thomas' cross about your position and wanting to make sure he understood your position and I just want to follow up on some of those questions.

Did you, yourself, reach any agreement or make any commitment to GBG that was not reflected in the transaction documents in connection with either SEA-2 or SEA-3?

A. I did not. I was not.

Q. Were you aware of anyone else making such an agreement?

A. No, I was not.

Q. Mr. Thomas asked you some questions about your preparation for testifying at this trial. Do you recall those questions?

A. I do.

Q. And he asked you about meeting with Mr. Stabile to prepare for testimony?

A. I do.

Q. Did you meet with Mr. Stabile 50 times to prepare for your testimony at this trial?

A. No. We met once for two hours.

Q. Mr. Thomas asked you some questions about your characterization of Li & Fung as Iconix' biggest customer. I just want to pull up a couple of documents here for you in the first instance, Mr. Cole.

MS. DABBS: Can we pull up, just for the witness and the parties, Government Exhibit 101, please?

Q. If you can take a look at this, Mr. Cole, and tell us, do