# EXHIBIT E

NAADCOLS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                         19 Cr. 869 (ER)

NEIL COLE,

                                         Sentence
              Defendant.

------------------------------x

                                         New York, N.Y.
                                         October 10, 2023
                                         4:00 p.m.


Before:

                    HON. EDGARDO RAMOS,

                                    U.S. District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
JARED P. LENOW
ANDREW MARK THOMAS
JUSTIN VICTOR RODRIGUEZ
     Assistant United States Attorney

SEAN HECKER
DAVID OSCAR MARKUS
ANITA MARGOT MOSS
     Attorneys for Defendant

Also Present:

Nicholas Kroll, Special Agent (FBI)

(Case called; appearances notes)

THE COURT:  Good afternoon to you all.

Everyone can be seated, and everyone can stay seated. You don't have to stand to address the Court unless you can't help yourself.

So this matter is on for sentencing, and in preparation for today's proceeding, I've reviewed the following:  I've reviewed the presentence report, which was last revised on September 12, 2023, prepared by U.S. Probation Officer Stephanie McMahon, which includes a recommendation; I've also reviewed the various letters submitted by Mr. Cole's legal team dated September 27, and 29, and October 9, 2023. The first of those letters includes letters submitted by various of Mr. Cole's family and friends, and one by his therapist.  And the other two letters attach documents relating to Mr. Cole's medical condition.

I have reviewed the government's submission of October 4, 2023; and there is a victim impact statement submitted by counsel for Iconix, from Skadden, Arps, Mr. Zornow, which is quoted extensively in the presentence report, but which I did not receive a copy of until earlier today.  Just prior to coming out, I received a proposed preliminary order of forfeiture/money judgment by the government.

Is there anything else that I should have received or viewed in connection with sentencing, Mr. Lenow?

NAADCOLS

MR. LENOW:  No, Judge.

THE COURT:  Mr. Hecker.

MR. HECKER:  No, your Honor.

THE COURT:  Very well.  Mr. Hecker, have you read the presentence report and discussed it with your client?

MR. HECKER:  I have, your Honor.

THE COURT:  Mr. Cole, have you read the presentence report, and discussed it with your attorneys?

THE DEFENDANT:  I have, your Honor.

THE COURT:  Aside from the sentencing guidelines issues, are there any further objections regarding its factual accuracy?

Mr. Lenow?

MR. LENOW:  No, Judge.

THE COURT:  Mr. Hecker?

MR. HECKER:  No, your Honor.

THE COURT:  Very well.  Although I am not required to impose a sentence within the applicable guideline range, I am required to consider the guidelines.  In order to do that, I need to do the calculation.

Now, there are two issues, as I understand it, that remain outstanding.  One relates to the enhancement for being a manager or supervisor of an offense involving five or more participants, or that was otherwise extensive.  The government argues that it is appropriate in this case.  I think, because,

and correct me if I'm wrong, Mr. Lenow, there are at least five participants, and the offense was otherwise extensive.  The defense objects to the inclusion of that enhancement.

So, Mr. Hecker, I'm happy to hear you.

MR. HECKER:  Your Honor, we largely stand on what we submitted in our letter.  Our perspective here is that, assuming the five individuals are Mr. Neil Cole, Seth Horowitz, Jason Rabin, Jerry Margolis, and Ethan Cole, I think importantly only one of those individuals was charged in connection with this offense.  And, as the Court knows, both Mr. Rabin and Mr. Margolis both testified at trial they did not believe they committed any crimes, and certainly not at Mr. Cole's direction.

Ethan Cole, before trial, the Court will recall, through counsel, indicated to the U.S. Attorney's Office that he, too, did not believe he engaged in wrongdoing.  Under those circumstances, I think, combined with the fact that at trial one Mr. Cole was acquitted of conspiracy, we think that the enhancement doesn't apply, shouldn't apply here.

THE COURT:  Mr. Lenow.

MR. LENOW:  Judge, I'm not sure I have much more to add beyond what's in our submission.  If the Court has any questions, of course I'm happy to address those.

THE COURT:  Well, I think Mr. Hecker makes an interesting point.  First of all, I think that two people were

NAADCOLS

charged with the offense.

MR. HECKER:  I said other than Mr. Neil Cole and Mr. Horowitz.

THE COURT:  Messrs. Rabin and Margolis, was it, both testified pursuant to immunity agreements, that they hadn't done anything wrong.  That, as far as they were concerned, they hadn't done anything wrong.  And so do they, strictly speaking, qualify as individuals that can be counted within the five, or is the government relying on the otherwise extensive part of that guideline?

MR. LENOW:  Judge, the answer is both.  In terms of Rabin and Margolis, we submit that the actual facts of this case, and there is extensive testimony from not just Rabin and Margolis, but also Horowitz about a number of conversations between the parties, it showed that these individuals were involved in knowingly illegal conduct.  That's simply what the evidence showed by a preponderance of the evidence.  But I think the Court doesn't even have to make the finding.  I do think the record supports it, and the witnesses kind of, who's not a lawyer, bottom line, take-away view of what their conduct was, is not dispositive.  What matters is the facts, and that establishes by a preponderance that these were knowing persons to the crime -- but, again, the enhancement also allows for it to be applied when the conspiracy or the conflict conduct is otherwise extensive.  So even if it were true, and, again, I

think the evidence shows it's beyond just Horowitz and Cole -- even if it were true that it were just Horowitz and Cole involved in this conduct, there was extensive evidence and testimony in the record about a number of other individuals who were used as, essentially, tools and implements of the conspiracy by Mr. Cole. We list them specifically in our submission.

And so I submit that even putting aside Rabin and Margolis and Ethan Cole, that that is sufficient to make -- for the Court, and the Court should find that enhancement applies.

THE COURT: I do find that it applies, but I am not counting -- and it applies because I believe that the conduct here was otherwise extensive, and that Mr. Cole was a manager or supervisor in connection with the conduct that was alleged at the trial. Not only were certainly these five individuals, Mr. Cole, Mr. Horowitz, Mr. Ethan Cole, of no relation, and Mr. Rabin and Mr. Margolis, not only were they involved actively over the course of several months involving several meetings, and significant negotiations, but other employees at Iconix were utilized, including lawyers, et cetera. So I do find that, on the facts of the case, the enhancement is appropriate.

The other enhancement as to which there is dispute is the obstruction of justice enhancement, and there, Mr. Hecker, I don't quite understand the defendant's position. I mean, Mr. Cole obviously testified at both trials. He testified

completely contrary to the testimony that was provided primarily by Mr. Horowitz, but others.  The jury necessarily, I think, had to have found that Mr. Cole's testimony was not credible.

Why shouldn't this enhancement apply?

MR. HECKER:  Your Honor, I mean, we made the argument in our letter.  I think that, in the context in which there have been two trials, he was acquitted of trial one of conspiracy, notwithstanding that the government is still talking about conspiracy, where the Court in trial one presumably accepted his testimony, and also that he looked back at the notes of the interview -- the Court will recall during the second trial we eventually got out of nowhere the interview notes of Mr. Cole's interview by the special committee.

Mr. Cole's been telling the same story from the moment these deals were done.  He believes it to this day.  And so I think, in those circumstances, where, obviously, others had a different understanding, the Court need not make a finding that he intentionally gave false testimony.

THE COURT:  Mr. Lenow?

MR. LENOW:  Judge, so your Honor sat through two trials, and in -- putting aside the jury for a second, I think it's the Court's role to make an assessment here.  Your Honor, even putting the jury verdict aside, your Honor saw Mr. Cole testify twice, your Honor saw Mr. Horowitz testify, and I would

NAADCOLS

submit that just using standard demeanor assessments, using assessment of the testimony, and also the documents in this case -- there were a number of powerful documents in this case that directly contradicted Mr. Cole's testimony -- I would submit that your Honor should make a finding that Mr. Cole's testimony was not credible, both because of his demeanor, and because of its substance, and also because of the ultimate determination of the jury beyond a reasonable doubt.

And we point to a few examples of even aside from the big picture point, of Mr. Cole denying that he was part of this illicit agreement. There are a number of discrete examples that were on their face incredulous, and we submit support the enhancement. We list some of them in our submission. Mr. Cole denied knowing about a GAAP, general -- the accounting standard. He denied having known Mr. Margolis, doing business with him. And there are some other examples we provide.

So I submit your Honor should make a finding, based on your assessment of the witness, that he was not credible, and that he perjured himself.

THE COURT: Yes. I believe the assessment is appropriate. As Mr. Lenow highlights, I sat through both trials. I saw Mr. Horowitz and Mr. Cole testify both times, and I have to say I believed Mr. Horowitz. I believed the version of facts that he told. I think it was consistent with the documents that were put into evidence, the testimony of

NAADCOLS

Mr. Margolis and Mr. Rabin, notwithstanding their disclaiming any liability or any wrongdoing. Specifically, I did not credit Mr. Cole's testimony that he had very little role in negotiating these joint ventures; that, you know, to the extent that anything untoward happened, it was all Mr. Horowitz' doing.

I don't need to go through chapter and verse of the particular areas where there was direct conflict. I think it is sufficient for me to find that Mr. Cole's purported lack of knowledge of the way that the transactions were structured, the reasons they were structured in that fashion, and the fact that they ultimately were structured in a way that had no economic substance is sufficient for me to find that he testified falsely in that regard. So I do believe that the enhancement is appropriate.

I think those are the only areas of disagreement with respect to the guidelines, and, accordingly, I find that the base offense level in this case is 7, to which 14 levels are added, because the loss was greater than $550,000. I think there's agreement as between the parties that the Court should utilize the $790,000 amount.

So 7 plus 14. An additional four levels are added, because the offense involves securities law violation, and at the time of the offense, Mr. Cole was an officer of a public company. Three levels are added because he served as a

manager, supervisor of conduct that involved at least five people, or was otherwise extensive. Two levels are added for obstruction of justice based on his testimony.

So the total offense level is 30, and because Mr. Cole has zero criminal history points, he's in Criminal History Category I. So, in summary, with a total offense level of 30, and a Criminal History Category of I, the applicable guidelines range is 97 to 121 months.

However, due to an amendment to the sentencing guidelines that will become effective on November 1, an additional two levels are subtracted for individuals with no criminal history points, and who otherwise meet certain criteria. Because Mr. Cole meets those criteria, as the government acknowledges, in that event, the total offense level would be 28; and the applicable sentencing range will be 78 to 97 months. The parties agree that I may sentence Mr. Cole based on the impending amendment. So, again, that's just the math.

So I find that the applicable guideline range will be 78 to 97 months.

Does the government wish to be heard prior to the imposition of sentence?

MR. LENOW: Judge, just two preliminary points. It may be a good time to raise them now. One is in terms of the two-level downward -- two-level reduction your Honor mentioned,

NAADCOLS

the government does not oppose that, but we would ask that the Court confirm with the defense that they're waiving any right to a resentencing or a challenge to the sentence based on this going into effect later on.

THE COURT:  I believe I received a letter from the defense in that regard.

MR. HECKER:  Correct.

MR. LENOW:  Okay.  And the second, just very briefly, Judge, on the leadership enhancement, the circuit guidance on this seems to suggest that the Court should make a finding a little more specific about who the individuals were, and so I would note in our submission, for the otherwise extensive aspect of the offense, we point to testimony and documents in the record related to how Justin Abrahamson, Marcia McLaughlin, Jason Schaefer, Lauren Gee, and Daisy Laremy-Binks, among others, were used in critical ways in furtherance of the offense.

So I would like to confirm the Court for the record agrees that those individuals are appropriately considered as part of the otherwise extensive nature of the offense.

THE COURT:  I do so find.

MR. LENOW:  Okay.  Thank you, Judge.

Turning to the 3553 factors, I won't repeat what's in our submission.  I do want to emphasize one or two particular points.  The first is this conduct was not aberrational.  It

NAADCOLS

wasn't a one time, one day incident.

As your Honor recalls, at trial there was extensive, extensive planning months in advance of these deals, and then months after them to cover them up. And so in terms of when we think about the level of culpability, and the defense points to some aspects that they submit are mitigating factors that -- you know, the loss amount, we have a forfeiture order for your Honor that is under a million dollars, for example, and they point to that as being, you know, compared to some other cases, perhaps a lower number.

One of the aggravating factors here is just the extensiveness and the complexity of the conduct. Mr. Cole was, on a day-to-day basis at times trying to scheme to cheat and lie in a number of ways in this case, and so I think just the long standing, repeated, intricate nature of the offense is really one of if not the most significant aggravating factors, along with Mr. Cole's role, of course, at the helm of this very substantial company.

And just the other point I want to address briefly is the health issues that Mr. Cole raises. We have no reason to contest any of the assertions about Mr. Cole's health, and we do agree that those are -- the Court should consider those in fashioning a sentence.

I do note a couple of things, though. One is that the government at least is consenting to -- is consenting to

NAADCOLS

Mr. Cole being released -- continue having his bail outstanding during the appeal. Like, in other words, we're not seeking remand prior to appeal, and so I do think there will be a significant amount of time, a year, perhaps more, for Mr. Cole to proceed with the various treatments that he outlines in his submission. And so if -- should the Court agree that bail pending appeal is appropriate, I do think that is a significant factor that recommends against a significant variance based on Mr. Cole's health issues in light of the fact that that would allow him to obtain the treatment that he submits he needs.

And I would also -- I'm sorry.

THE COURT: I'm sorry. So are you saying that the government does not object to Mr. Cole remaining on bail pending his appeal?

MR. LENOW: Yes, Judge.

THE COURT: Okay.

MR. LENOW: And just the second point is the Bureau of Prisons does -- even absent that factor, though, the Bureau of Prisons does deal with these very serious illnesses, unfortunately, on a somewhat routine basis. There are many individuals who are serving time in the Bureau of Prisons who receive treatment, and significant -- and treatment that meets the needs, even for serious illnesses. And so even if the bail pending appeal were not an issue here, and, again, we're consenting to it, I do submit he would be able to receive the

care he needs in the Bureau of Prisons. And I don't think we've been given any reason that that would not be the case.

THE COURT: Let me ask you, on restitution, the government is not seeking restitution in this case, correct?

MR. LENOW: We are not, your Honor. Judge, we do think that the Court could order it as a condition of supervised release. This is a Title 15 case, and so the normal statutes are not implicated, but, as a condition of supervised release, the Court I think would be within its discretion to order it.

THE COURT: So are you taking a position?

MR. LENOW: May I have a moment, Judge?

THE COURT: Sure.

MR. LENOW: So, Judge, I think our position is that we are not taking an affirmative position here. Mr. Zornow is here for the company, and can speak to any factual questions or legal questions your Honor has on this. It is our position that the Court does have the ability to order restitution, but I think Mr. --

THE COURT: I take it that -- because, generally speaking, in ordering restitution, there is a number that the government proves up, and/or there's no objection to, and that's the number that I order. Here, and I haven't dealt with this issue in the past, the company is requesting I think $130 million in restitution, based on a number of different

NAADCOLS

factors.

I have the authority, as a condition of supervised release, to order that he pay restitution.  Am I obligated to accept the particular number, or can I order restitution within zero to 130 million?

MR. LENOW:  Judge, our position is your Honor has the discretion to pick the appropriate number, and I think -- I have conferred with Mr. Zornow in advance of sentencing, and I think he's best positioned to advocate for the company's position.

THE COURT:  Okay.

MR. LENOW:  I do think what your Honor may hear from him is the company appreciates the nuance in the facts here, that there were multiple investigations, that certain work may be more attributable to DOJ investigations, as opposed to the SEC, and so I think the Court could make a finding that's anywhere between zero and the larger number you cited.  So I think there's certainly room for that nuance.

THE COURT:  Okay.  Anything else?

MR. LENOW:  No, Judge.

THE COURT:  I believe that's Mr. Zornow in the gallery.

MR. ZORNOW:  It is, your Honor.

THE COURT:  Am I pronouncing your name right?

MR. ZORNOW:  Yes.

NAADCOLS

THE COURT:  Could you come up?

MR. ZORNOW:  Certainly, your Honor.

THE COURT:  Talk to me about the amount of restitution you believe would be appropriate.

MR. ZORNOW:  Yes, your Honor.

First of all, we are not going to press the issue of whether Title 15 offenses are covered by the restitution statute, so what we're asking is that the Court impose restitution as a condition of supervised release.  And, for simplicity's sake, what we would press are the necessary expenses that the company had in cooperating, as it did from the moment the government contacted the company, expenses in connection with that investigation and with the prosecution.

I don't have -- that number that I've been provided by the company is roughly $14 million.  If you put to the side the legal fees that were advanced for Mr. Cole's representation for the two trials, which is well in excess of $20 million, you know, we -- I've learned a lot about the restitution regime, which is quite complicated, and read cases like *Afriyie*, if I'm pronouncing that correctly.  We understand that we are not entitled, under the provision dealing with necessary expenses, to the cost of the original investigation, that we're confined to expenses in connection with the Southern District of New York investigation, and the trials.

What I would propose, your Honor, unless your Honor

has a figure in mind, under 18 U.S.C. 3664(d)(5), you can defer a final order on restitution for up to 90 days. And what I would like to do is to go over all the bills, which include not only our bills, but bills submitted by Lee Richard's firm, which did the original internal investigation. And we're not going to, you know, put that in, but Mr. Richard was intimately involved in briefing the Southern District and in responding, as we were, to various requests that the Southern District had. And then there are legal fees that were incurred by individual counsel for various witnesses that were interviewed during the course of the investigation, some of whom actually testified during the trials.

And so what I'd like to do is be in a position, with a little more time, if your Honor -- I wanted to see whether your Honor was inclined to order restitution as a condition of supervised release, and, if you are, I'd like to really give you a conservative, precise number that lines up with the case law in terms of what's in and what's out.

THE COURT: It would be obviously useful -- I mean, I'm not inclined to give you what you ask for in your letter, but I believe that, you know, some reasonable amount is likely appropriate based on the facts of this case as I know them. It would be useful to know, as well, the extent to which the company was insured for any of these amounts that were expended.

NAADCOLS

MR. ZORNOW:  Absolutely.  We would only be bringing forth out-of-pocket, not covered by insurance.

THE COURT:  Okay.  Before I have you sit down, Mr. Zornow --

Mr. Hecker, is there anything you want to say in this regard?

MR. HECKER:  Well, I guess, look, before the Court even considers awarding restitution as a matter of its discretion in connection with supervised release, we'd want an opportunity to challenge any evidence that's actually put forward.  And I know the Court is signaling a willingness to hear us on that.

I will say this.  I think it's an important factor here, which is that Iconix is owned privately by a very wealthy family that purchased the company after these expenses were incurred, knowing full well that they were buying an asset that had an ongoing government investigation, that was going to require it to spend money to cooperate with the government.  So I think net/net you're talking about awarding a billionaire family a windfall that they really aren't entitled to, and that the Court does not have to order in these circumstances.

Under all of the circumstances of the case, and I'm happy to go into some of this, but the notion that they'd be looking to Mr. Cole now to make them whole for agreeing to cooperate with the government, I mean, I've never -- I haven't

seen that ordered in many cases I've been involved in, and particularly where the owners of the business didn't go out of pocket for those expenses.

THE COURT:  I get that ultimately, to the extent that the stock owners, the stock holders of the company, they're not going to benefit from any order of restitution, but I would like to know what the facts are before I make that determination.  As I indicated, I know that the PSR quoted from your letter extensively, but I only just got the entirety of the letter today when I asked.

So I'd be happy to await to get from you a submission as to what the particular expenses were that you believe are -- ought to be compensated, and obviously you will -- Mr. Cole will have an opportunity to respond, and to argue that no restitution is appropriate in this case.  Okay?

MR. HECKER:  Very well, your Honor.

THE COURT:  Do you want a deadline, sir, or -- you have 90 days for me to decide, so if you can get it within a month, that would be helpful to the Court.

MR. ZORNOW:  30 days would be great, and I'll try to do it before then.

THE COURT:  Okay.  Do we have a date for Mr. Zornow?

THE DEPUTY CLERK:  Yes.  November 10.

MR. ZORNOW:  Very well, your Honor.

THE COURT:  Thank you very much.

MR. ZORNOW:  Thank you, your Honor.

THE COURT:  Mr. Hecker.

MR. HECKER:  Thank you, your Honor.

And I'm aware the Court has read our lengthy submissions, so I don't want to repeat what's said there, but I do want to frame a couple of the key 3553(a) factors that, in our view, support a request for a sentence of probation, potentially with a period of home confinement.

First, I'm going to focus on Mr. Cole's extraordinary history of contributions to society, philanthropy, and helping others.  Second, I'm going to talk a little bit about some of the particulars of the circumstances of the offense, including the actual amounts involved of the purported inflated revenue, and the concern here about disparate treatment.

Next, I want to focus on what consequences have befallen Mr. Cole since the events of almost 10 years ago, and the punishment that the system has meted out already.  Finally, I want to talk about his health issue.  If I could just say a minute about that up front, actually, because with respect to my colleagues, who I have no doubt heard from the BOP that they're capable of caring for someone with a recurrence of cancer, with an underlying, significant health condition, it doesn't provide me with a lot of comfort based on my own experience representing clients with even modest health conditions.  So, you know, I appreciate that the government has

NAADCOLS

agreed to bail pending appeal, because of the substantial issues on appeal, but I don't know that that's a reason not to factor it into the appropriate sentence as a 3553 factor as well.

So just briefly, your Honor, you know, over the course of two trials, which focused really on the exclusive question of whether or not a couple of joint venture transactions from almost a decade ago should have been treated as generating as much revenue as had been booked, and where the key government witness obviously had deep disregard for Mr. Cole, it's really easy to get a distorted view of the man. And the reality is this is someone over an extended business career, who positively impacted an incredibly large number of people, and the Court sees that I think in the many letters that were submitted.

If you go back even to the work that he did in building the business his father had initially created, the Candies business ultimately grew to over 100 stores and 300 employees, including folks like Dari Marder, who's written to the Court to describe how supportive Mr. Neil was as a boss, the way in which he was a partner to her, promoted her over time. She ultimately became the Iconix brand group's chief marketing officer. And she describes in detail Neil making her and many other long-term employees feel like family, proud to be part of the businesses that he built.

NAADCOLS

He could be demanding for sure, and that came out during the trial, but he instilled loyalty, and supported those who were with him.  And when he founded Iconix in 2005, he completed revolutionized the brand licensing business.  He took these Iconix legacy brands, harnessed the value of the property, used it to generate royalties guaranteed by the licensing agreements.  That model was incredibly successful, and in just a few years, it became one of the fastest growing companies in the world.

He employed countless people.  He enriched both his employees and his investors.  One of our letters is from the chief investment officer of the Baron Fund, Cliff Greenberg, a very well-respected investor, who wrote to the Court describing Neil as a trail blazer in the industry, someone who's quick to support charitable causes, and who made real contributions in business, politics, and society.  And I'd submit, Judge, that's a theme than runs throughout all these letters, people he met in business who looked to Neil as a model of how to take his position, and what he created, and do good with it.  Something that those who interacted with Neil did as a result of their experiences with him.

The model he created became imitated widely, and he was rightly viewed as a visionary in figuring out how to effectively leverage brand intellectual property rights.  And the businesses that succeeded as a result of following in his

footsteps is really a testament to him, and it says something about the value he created in the world, and the people he employed as a result.

And I want to talk just about the philanthropy, because the reality is, as his business grew, and he became successful, because he was a shareholder of the business that he created and built and grew, he used those resources and the relationships that he developed with others to do good. And I don't just mean by donating money. I don't mean by donating money, although he did that generously. He supported HIV, AIDS research, children's health care. He took on issues of homelessness through his contributions. But I mean very significant philanthropic projects that required real work where the aim was about helping others.

And, your Honor, I'm sure the Court has been involved in sentencing for countless people. This is not typical. This is extraordinary. He created the Candies Foundation in 2001 to take on the epidemic of teen pregnancy. Numerous letters write about that work. He leveraged relationships he developed through his work with celebrities to create public service announcements, so teens would see and care about those announcements.

And the reality is that the Candies Foundation he created was credited wildly with playing a significant role in reducing the teen pregnancy rate in this country, and he's

quite proud of that understandably.  And many of the folks who wrote in talked about the incredible impact of that foundation, including former Governor Cuomo, Sam Edelman, who once worked directly for Neil when he was at Candies, and became a lifelong friend.  He really became a model to these folks in their own careers as business leaders about how to do good in the world.

He also put in his own time, served on the board of his daughter's school, of the Mt. Sinai Children's Foundation. He got involved in government in positive ways, Governor Cuomo's Spending and Government Efficiency Commission a decade ago.  He created the Women's Equality Party.  And it's true some of these endeavors were public, and I could see how one could look at them and say, well, he's trying to make himself look good, all of those things.  But the reality is we submitted numerous letters about discrete episodes, even dating back to Neil's youth, when he helped people personally, when he was there when it mattered to people, outside the public eye, not for credit, literally dating back to stopping by the side of the road as a teenager, helping a young man who had a bike accident.  That's in the letter from Mr. Fisher.  Mentoring countless young people.  We have a number of letters where people describe Neil taking time to meet with kids who were starting off in their careers and having difficulty, unsure of how to move forward, where he was there for them, helping them with foundation work themselves, putting in the time.  He

NAADCOLS

didn't just contribute to those organizations. He was willing to go well beyond that.

And he's shown up for friends when they faced difficult circumstances, and you have letters from folks like Gary Bader, who talked about his own fight with cancer; Dr. Lawrence Howard, who had a terrible medical emergency at dinner with Neil, and Neil spent hours with him in the hospital. He's someone who's shown up for people, and he's done it in ways large and small. I think that's an important factor for the Court to consider, and something that would have never been in front of mind to the Court just sitting through these trials.

Turning to the offense conduct, and the events that led us here, obviously the Court -- I mean, the jury in our trial, the second trial, found that in connection with these two transactions from June and September of 2014, that there was an agreement to inflate the value of those transactions by $5 million and $6 million respectively, a total of $11 million, that the jury concluded shouldn't have been booked as revenue that was booked.

And as we noted in our letter, in that year, Iconix booked over $460 million of revenue. We're talking about a bit more than two percent of the company's revenue for the year. And even the government's witness, the SEC economist who testified at trial, said that those amounts were not necessary to meet consensus revenue estimates for the year. Obviously,

the issue that was presented focused on quarterly earnings, but if you look at the entire year, these revenues weren't necessary to hit the numbers.

We talked about this already in connection with the enhancement, but for purposes of sentencing, I think there is a significant concern about potential disparate treatment, of disparity in sentencing.  Only two people have been prosecuted. I know Mr. Horowitz has not yet been sentenced.  I think that, under the circumstances, having Mr. Cole be the only one facing significant sanction of this kind, when the other purported coschemers, as the government put it in trial two, weren't prosecuted, risks disparities in sentencing that would be unjust.

And then, finally, I just want to talk about how this has played out for Mr. Cole.  Mr. Horowitz' departure letter to the Iconix board in 2015 led to this series of investigations which precipitated Neil stepping down from the company in August of 2015, eight years ago.  He wasn't only ousted from the company he founded, the company that was his life's work. He lost the vast majority of his wealth, and, in addition to losing the value of the company's stock, since most of his wealth was tied up in the stock, he returned $8 million to the company after the company decided to restate its financials. And as his brother Kenneth noted in his letter, his ouster could not have been more devastating to Neil and his family.

NAADCOLS

He had two sons working at the company who also lost their jobs. In his subsequent attempts to rebuild new businesses, into which he poured substantial resources of his own, really couldn't get off the ground with this cloud of the government investigation hanging over him. That's in 2015 when he leaves the company.

It's not until the end of 2019, five years after the offense conduct, that he was arrested to face these charges, and then COVID hits and delays even the first trial. That trial didn't take place until October of 2021, seven years after the joint venture transactions at issue. It's an extraordinary amount of time between the offense conduct and the trial.

And before the first trial, in the early days of COVID, he loses his mother, who passed way in July of 2020. His final conversations with his mother were devastating for him. They were consumed by her concern about what was going to happen to her son, and she died tragically, with her son facing indictment and trial. That extended period of time post-indictment, pretrial, under supervision is extraordinary. We're talking about someone who will have been, by December, on pretrial supervision for five years. That's highly unusual in a context like this. Those are real consequences, and I think the Court can consider them in determining what the appropriate sentence is here.

NAADCOLS

He obviously was acquitted of the conspiracy count in the first trial, with the jury unable to reach a verdict on the remaining counts. And he felt an understandable sense of relief with that positive result, but then the government decided to retry the case, and I think it's fair to say that to those of us who follow such matters, it wasn't obvious that the government would retry the case, first, because the jury had rejected the core conspiracy charge in trial one. It's hard to interpret that aspect of the verdict as accepting the government's theory, Mr. Horowitz' testimony, arguably accepting Neil's testimony in that trial, and then by early 2022, we're talking about eight years from the time of the offense conduct -- you don't see many trials brought so long after the conduct at issue.

And, then, just the reality of this for Mr. Cole. He'd been living with this hanging over his head for so many years. He'd been under a cloud since 2015. He'd been unable to start new businesses. He had a pending SEC case. We speak about Iconix coming here and asking to be reimbursed for the cost of cooperating with the investigation. He had to sue Iconix to get them to advance fees for his first trial. I mean, this was -- there was nothing easy about this, and it lasted for a period that is extraordinary and atypical.

And so, look, the government could have said, look, enough's enough. We've done enough here. But they decided to

press ahead, and as they have a right to do. I'm not criticizing that position. I'm simply saying the upshot of it is for someone in Mr. Cole's position, he has been through a shocking amount over a shocking amount of time before coming to this day. We're not starting with someone committing conduct, a year later goes to trial, is convicted, and then we're at sentencing. This is someone who's been under criminal supervision for five years.

So I think that the upshot is he has suffered massively from this entire case. He still has a pending SEC case. It's not easy to get the SEC to engage and try to resolve this matter. The upshot is that the goals of both specific deterrence and general deterrence can be met here without a substantial sentence of imprisonment.

He's a first time offender. He's 66 years old. He's been supervised for five years. He has extremely serious health issues in front of him. He is -- he poses zero recidivism risk. That's the specific deterrence question. And in terms of general deterrence, it's very difficult to argue that a CEO or a CFO confronted by difficulty hitting analyst expectations in a given quarter is going to say to themselves, I'm going to engage in accounting fraud, if they know the consequences are going to consist of internal investigations, restatements, being thrown out of the company they created, sued by the SEC, subjected to not one but two criminal trials,

being branded a felon, as if that's not enough to deter them? Respectfully, I think this is already a cautionary tale for the market, for people in positions that the government cares about when it comes to thinking about general deterrence. It's the ultimate cautionary tale to the corporate executives already.

I know we spoke in our letter about what's happened since trial, but because of -- everything I just described is all happening before trial. Since trial, he's lost his family, his nuclear family. His wife announced she was seeking a divorce the day after the verdict. She separated from him, taking their daughter with her. The loss has been immense.

He's now confronting reemergence of a cancer that began as a thyroid cancer back in 20 -- 2009, 2010. The cancer's returned to his lungs, and, as you can see from the medical records, the treatment is a bit uncertain at the moment. But there's currently a recommendation for radioactive iodine treatment at Sloan Kettering. We're going to know more in the coming months. But his underlying condition, and we talked about this in our letter, that dates back to childhood, but still effects him, this fibrous dysplasia, makes it difficult to make treatment determinations, because it can affect his bone marrow, the treatments themselves. And the fact that he already had thyroid cancer.

So this isn't a minor issue. It obviously hasn't gotten to an advanced stage yet, but the prognosis is that this

issue is going to become more significant over time. We are grateful that he'll have bail pending appeal, so he can focus on these issues now, and he will do that obviously. And, hopefully, in time, he'll come up with a treatment plan that makes sense, and that can help fend this off. But it's a very serious issue, and it's one that of course the Court can consider in determining the appropriate sentence here.

I would just say, finally, that this case has been just tortuous for Mr. Cole, and I know that based on my own countless discussions with him. It rightly or wrongly consumes every waking hour he has. It prevents him from finding peace. And you saw a description of that in the letter from his treating psychologist, who he's been treating him now for a year, that those consequences are real, too. I'd argue every bit, if not more real than the cancer diagnosis.

He's going to use the time he has before the appeal is decided to continue to do his best to address these issues. He's committed to doing that. I think the letter from his psychologist makes that quite clear. He's going to try to repair his relationships. He's going to stay in therapy. He is going to try to rebuild his life. But, your Honor, respectfully, the sentence we're seeking we think would be sufficient but not greater than necessary to achieve all the purposes of sentencing.

THE COURT: Thank you, Mr. Hecker.

NAADCOLS

Mr. Cole, you have an absolute right to address the Court before I impose sentence.

Is there anything that you wanted me to know?

THE DEFENDANT: Your Honor -- sorry. Your Honor, I stand before you a very different man than I was 10 years ago when the events that lead to this case occurred. In the last decade, I humbly admit that I have lost everything that was so meaningful to me.

Mr. Hecker spoke of many of these losses: My family, my health, my finances, my reputation, my charitable foundation, many of my real friends -- or I found out who the real ones were, and my career. I, too, want to briefly touch on these points, even though it's really hard to put into words how difficult the time has been.

I'm deeply sorry for the pain this case and these trials have caused for so many, the hundreds or so employees, including my sons, who have all lost their jobs at Iconix; my children, who have suffered greatly through trauma and bullying due to their father's very public arrest and trials; the company that meant so much to me, that I loved and worked so hard for, to build, that was taken away; and the loss of my charitable foundation that was really the true pride of my work.

Shortly before my first trial, my mom passed away, and I can't help but remember how painful it was for her to worry

about me as her health was declining.  The result in the second trial was truly shocking to me, and obviously very painful. The loss was compounded by the loss of my family, as my wife left me the day of the verdict, taking my daughter with, and the person that was -- I shouldn't say person, but my devoted dog, Cookie.  As painful as this remembrance has been to me, I can only imagine how painful it has been for my children, and my family, my brother and sister.

I will live with the guilt of causing so much pain for the rest of my life.  Your Honor, I am regretful, I'm apologetic, and I'm sorry for the time this Court has had to spend on this matter.  I truly hope you will give me the opportunity to fight my cancer, and work on improving my mental health, and the ability to provide for myself and my family.  I want nothing more than to get better, improve myself, and return to being a positive impact on society.

Thank you for listening.

THE COURT:  Thank you, Mr. Cole.

In deciding what sentence to impose, in addition to the sentencing guidelines, I have considered all of the factors set forth at section 3553(a) of Title 18 of the United States Code, including, as most relevant to Mr. Cole, the nature and circumstances of the offense, and his history and characteristics.  I've considered the need for the sentence imposed to reflect the seriousness of the offense, to promote

respect for the law, to provide a just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide Mr. Cole with needed medical care in the most effective manner. I've considered the need to avoid unwarranted sentence disparities among similarly-situated defendants, and the need to provide restitution to any victims of the offense.

Having considered these factors, it is my intention to impose a sentence of 18 months on each count, to be served concurrently. That will be followed by three years of supervised release on each count, also to be served concurrently.

I will not impose a fine as I find that Mr. Cole will not be able to pay a fine, due to the other financial aspects of the sentence, and I will execute the proposed consent order of forfeiture that has been provided. I will await the submission from Iconix concerning any possible restitution. I will order the mandatory special assessment of $100 on each count of conviction, for a total of $800.

I believe that this sentence is sufficient but not greater than necessary to comply with the purposes of sentencing set forth at section 3553(a)(2) for the following reasons: As I noted earlier, Mr. Cole, I watched, I sat through both trials, and, frankly, I believe Mr. Horowitz, and I did not believe you. I believe that you knew that the two

transactions involved had no economic substance.  I believe that you entered into those transactions knowing that you would be paying back the $5 million and $6 million.  I believe that you did that because of your desire to have the company meet its revenue market consensus -- consensus revenue targets, as it had for so many quarters before, and you did it for that reason.

Obviously, one of the cruel ironies of this case is even if you hadn't met those two quarters, those quarterly revenue targets, in 2014, you would still have met the consensus revenue estimates for the entire year, as the government acknowledged.  So I start there, and I start with the fact that I believe that you knew that what you were doing was wrong.

Importantly, in this case, I found that you obstructed justice, and that is as bad as the offense that you were charged with committing, perhaps in some circles, particularly for folks who sit up on benches like this, perhaps even worse.  You had an opportunity I believe, there were extensive negotiations with the government, to admit to your conduct, and you chose not to.  You chose to go to trial, which is your right.  You chose to take the stand, which is your right.  Then you provided testimony which was not truthful, which is not your right.  So because of that, I do believe that a sentence of incarceration is necessary, in addition to the conduct for

NAADCOLS

which you were charged.

I want to come back to something that the government said, because I do believe that a sentence below the applicable guideline range, and indeed far below the applicable guidelines range is appropriate. The government said that this conduct was not aberrational, and that is, strictly speaking, true, because it wasn't a one time, thoughtless, reckless idea that you had that was executed over the course of a day or two or three. This scheme did take place over several months, but I think, as I think about this case, it was aberrational in terms of the lifetime of this business.

There's nothing before me to suggest that you had engaged in wrongdoing with respect to Iconix at any other time. You were in charge of the company for many other. It was a successful company. It was a company based on your idea, which was fairly novel at the time, and you created something that was real, that was substantial, and that was successful. You employed people. I take all of the letters that were written at their word, and not only did you employ people, but you gave people opportunities, especially young people.

So all of that I take into account, and, from that perspective, this was aberrational. The transactions in the indictment took place over three or four or five months, negotiations included, and I think that over the course of the arc of your career, that is aberrational, and I think in large

part requires a sentence outside of the range that would be suggested under the guidelines.

I also take into consideration the fallout from what happened. The company was largely decimated in terms of its value. Many people lost their jobs. Obviously, none of that had to happen. Obviously, I can't lay all of that on you, and the decisions that you made, but it is a real result, a real consequence of certain decisions that you made.

Now, in terms of the 3553 factors, you obviously -- and your attorneys make a very strong showing. I do believe that with respect to specific deterrence, that's not an issue here. I don't believe that you'll ever commit another offense. I don't believe that you'll ever go before another sentencing judge having committed an offense, not just because of your age, but because I think that you've seen what can happen, and understand the consequences that in here, in conduct such as this -- in terms of general deterrence, again, I don't believe that anyone will look at what's happened here and see that you, in addition to everything else that you've lost, have gotten a sentence of 18 months, and then decide, well, that may be worth it to me. I don't believe that that will happen.

So in terms of general deterrence, I believe that this sentence is appropriate. I read the letters that your friend submitted and family members submitted. I do not doubt the sincerity in everything that was written in those letters. You

are a person who, prior to the summer of 2014, had lead a life, raised a family, built a business, were a good husband, father, sibling, friend, so all of that is taken into consideration.

I also read the letters from your doctors. Obviously you're dealing with a very serious disease. You will continue to deal with it for some period of time. However, I do not find that the medical services that can be provided by the Bureau of Prisons are insufficient to meet your needs, and as has been stated, you will be out on bail pending appeal, so that period you'll have the opportunity to continue to see your chosen medical care providers during that entire time.

The charitable efforts that have been talked about also go back decades. I am frequently faced with defendants who have been convicted, who after their arrest and after their conviction engage in substantial charitable works in a cynical, I think, effort to sway the Court. That's not what you did. You appeared to be sincere in the causes that you took on. One of them was particularly successful, and had played some role, I don't know how much of a role, but certainly played some role in reducing teen pregnancy in this country, which is a wonderful thing indeed. So clearly you are a person who is not beyond redemption, and all of that, also, gets taken into account.

With that, is there anything other than what has already been argued why I should not impose the sentence as

I've indicated?

Mr. Lenow?

MR. LENOW:  No, your Honor.

THE COURT:  Mr. Hecker.

MR. HECKER:  No, your Honor.

THE COURT:  In that event, it is the judgment of the Court that you be sentenced to 18 months on each count of conviction, to be served concurrently.  That will be followed by three years of supervised release on each count, also to be served concurrently.

The standard conditions of supervised release will apply.  Those conditions are set forth in the presentence report at pages 47 and 48 -- I'm sorry, 47 through 49, and are included in the judgment in their entirety herein.

The following mandatory conditions will be applied. They're set forth at page 47, and they are that you not commit another federal, state, or local crime; not unlawfully possess a controlled substance.  I will suspend the drug testing condition, because I do not believe that that is necessary in this instance.  Those mandatory conditions are included in their entirety in the judgment.

I also impose the following special conditions, which are set forth at page 49.  They are included in the judgment in their entirety, and they are that you must participate in an outpatient mental health treatment program approved by

probation, and continue taking any prescribed medications unless otherwise instructed by your health care provider.

You shall submit your person, and any property, residence, vehicle, papers, computer, or electronic data storage devices, to a search by any U.S. Probation Officer and, if needed, with the assistance of law enforcement. The search is to be conducted when there is reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct by Mr. Cole.

You must not incur new credit charges or open additional lines of credit without the approval of probation unless you are in compliance with the installment payment schedule, and must provide the probation officer with any requested financial information.

If you do not live in the district during the period of supervised release, it is recommended that you be supervised by the district of residence.

As I indicated previously, I will not impose a fine. I will execute the preliminary order of forfeiture, which seeks forfeiture in the amount of $790,000. I believe approximately $790,200.

I will await the submissions concerning restitution, which, in any event, will be applied, if at all, within 90 days.

Are there any open counts?

MR. LENOW:  No, Judge.  And just in terms of the restitution, it sounds like just from what I heard your Honor saying, you will impose it as a condition of supervised release, but the question is just the amount based on the submissions from the company.

Is that correct?

THE COURT:  Correct.  If I impose restitution.

MR. LENOW:  Understood, your Honor.

MR. THOMAS:  Because the Court is imposing judgment now, I think the conditions of supervised release have to be part of the judgment.  The ultimate finding of restitution may be zero, but I don't know if the Court does not impose it today, that in 90 days it could.

THE COURT:  Yes, that's my understanding.  Do you have a different understanding?  Or perhaps I'm missing something.

MR. LENOW:  Judge, I think it was dealt with by Judge Rakoff in the decision extensively cited by the defense.  I believe your Honor has to impose restitution as a condition of supervised release at this point, because you are imposing the judgment now, and then what can be determined later is the amount.

THE COURT:  Okay.

MR. LENOW:  But I believe the condition has to be imposed now.

THE COURT:  So restitution, if any is also imposed as

NAADCOLS

a condition of supervised release.

MR. HECKER: And, your Honor, just for the record, we would object to the imposition of restitution, because the parties seeking restitution aren't a victim under the law. I also think, as a practical matter, the Court could amend the judgment if it ultimately determined, notwithstanding our objection, that restitution's appropriate.

THE COURT: Yes. So what I've indicated is that restitution, if any, is also imposed as a condition of supervised release, and, if any, will be determined over the course of the next 90 days.

Does that address your concern, Mr. Lenow?

MR. LENOW: Yes, Judge.

THE COURT: Okay. With that, I think that constitutes the sentence of the Court.

Mr. Cole, as you obviously are aware, you have a right to appeal both the conviction and the sentence. However, there are strict time limits within which you need to perfect that appeal.

So, Mr. Hecker, will you assure me that you will promptly and thoroughly discuss with Mr. Cole his appellate rights?

MR. HECKER: We absolutely will, your Honor.

THE COURT: Now, I take it that you are making an application today, Mr. Hecker to allow Mr. Cole to remain on

NAADCOLS

bail pending appeal.

MR. HECKER:  Yes, on consent from the government.

THE COURT:  Government does not oppose?

MR. LENOW:  That's correct, Judge.

THE COURT:  Very well.  Mr. Cole may remain on bail pending appeal subject to the same conditions that he has been over the last number of years.

Unless there's anything else, Mr. Lenow --

MR. LENOW:  Nothing further, Judge.  Thank you.

THE COURT:  Mr. Hecker?

MR. HECKER:  No, your Honor.  Thank you.

THE COURT:  In that event, we are adjourned.

Mr. Cole, good luck to you, sir.

(Adjourned)