EXHIBIT H

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL6          Horowitz - Direct          Page 350

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1179 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, what's the subject line of the e-mail?

A. "Invoices."

Q. Can you read the body?

A. "Hi, Seth. Sorry I was interrupted. It would be helpful if you could please confirm the invoice numbers for the 2.4 million payment which we received. Thank you."

Q. Mr. Horowitz, did you have an understanding about why Mr. Cole, Ethan Cole, was asking for this information?

A. Yes.

Q. What's your understanding?

A. He was trying to line up our payment of 2.4 -- approximately 2.4 million with the invoices that he had dropped off.

Q. Why did he need your help doing that?

A. Because he had dropped off invoices in excess of the $2.4 million, and we were going to pick which ones to pay, and he needed to kind of match up which we paid and which ones we did not.

Q. Do you remember whether you responded to him?

A. I don't recall.

Q. You can take that down, Mr. Charalambous.

LA7PCOL6          Horowitz - Direct          Page 351

Mr. Horowitz, we talked about the Middle East joint venture earlier and the fact that it was slated to happen in the fourth quarter of 2014. I think you told us it did ultimately happen; is that right?

A. That is correct.

Q. Can you describe for us what you recall about the closing history of that transaction?

A. Sure. The transaction was supposed to close December 15th, that Monday. We received the short report and the SEC inquiry on that day. I would say the office was turned upside down for about 48 hours.

My understanding, as of December 17th, was that although we had gone back and forth on doing the joint venture with GBG, that we were not going to be doing any more joint ventures, as the SEC inquiry was focused in large part on the joint ventures.

On December 18th -- and I remember the dates well because it's my anniversary, and I was off, and I remember where we were -- I got a phone call that -- I got a phone call from Ethan Cole that the joint venture was back on. He started listing the details of it.

I got off the phone. I don't recall whether I called Neil Cole or Neil called me, but he told me -- Neil told me that the deal was on. He had gone over to GBG himself to negotiate any remaining terms.

LA7PCOL6          Horowitz - Direct          Page 352

In an e-mail or phone call, I asked him if there was anything else he needed me to do, and there was not. And that is how I recall that day ending, and the Middle East joint venture happened.

Q. Earlier you told us that you thought that transaction was used to return some of the money that Iconix owed to GBG. Why do you think that?

A. That transaction had a unique and, to my knowledge, unjustified $3.1 million payment back to GBG for something that was called market research and analysis. In this case, the return of funds to GBG was documented in the Middle East joint venture transaction documents.

Q. Mr. Horowitz, you described a number of transactions, two transactions where Iconix agreed to return money in exchange for an increased purchase price. With respect to the two transactions you described, the SEA-2 and the SEA-3 transaction, do you know for certain, based on your conversations with Mr. Cole, that that was the nature of the agreement?

A. Yes.

MR. REISNER: Objection, leading.

THE COURT: Overruled.

A. Yes.

Q. Is the same true with respect to the Middle East transaction?

LA7PCOL6          Horowitz - Direct          Page 353

MR. REISNER: Same objection.

THE COURT: Overruled.

A. I cannot be certain of that.

Q. Mr. Horowitz, after the comment letter and the short report came out, did Mr. Cole give you any instructions for what to do with materials that you had?

A. Yes, he did.

Q. Can you describe that conversation?

A. Yes. It was an evening at the Iconix office, many people had gone home. I was at my desk. Neil came to my door, kind of stood outside my door, looking very frazzled and angry. And he said to me, quite simply, "I need you to get rid of any e-mails with Jason and Jared and" -- I believe he said -- "Yapp, and I'm going to do the same," and he stormed off to his office.

Q. And who is Yapp?

A. Yapp is Kevin Yapp. He was an owner of New Rise, a licensee of ours for Rocawear and somebody that we were considering using for Rocawear Kids.

Q. How did you react to Mr. Cole telling you this?

A. I was scared, nervous, shaking. I remember thinking, I don't know what he wants me to erase but I better do what he said. I was panicked.

Q. And what did you do?

A. I sorted e-mails by their size, looking for what would be

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL6    Horowitz - Direct    Page 354

term sheets with Jason and Jared as recipients, and I deleted them.

Q. Did you do anything else to destroy documents?

A. I did.

Q. Did you have a further conversation with Mr. Cole about this?

A. I did.

Q. Can you describe that conversation?

A. This was, I believe, sometime at the very beginning of 2015. I was in Neil's office, and he asked me if I had gotten rid of any hard documents or any copies of anything with Jason and Jared, and I said I had not but that I would, and I did.

Q. Can you describe what you did?

A. I took home a few of the binders that I had that were labeled GBG and Li & Fung. I took them home and threw them down a garbage chute.

Q. Why did you take them home?

A. I was scared that somebody might find me doing it and felt that I could just take them home and throw them out.

Q. When you say you were scared someone might find you doing it, what do you mean by that?

A. Somebody at the Iconix office would see me. I didn't want to raise any suspicion. I was nervous in making a series of bad decisions.

Q. Did you keep anything?

LA7PCOL6    Horowitz - Direct    Page 355

A. I did.

Q. What did you keep?

A. I kept a binder that had the financial forecasts in them. I just kept that in the office. I did not get rid of that, and at a later date, I sent a series of e-mails from my work account to my personal account to print out to make sure that I had hard copies of things.

Q. Why did you keep those things?

A. I kept those things because I knew that we had done something wrong. I knew that we could be in trouble, and I knew from Neil's behavior then, and going forward, that he would do anything to use others, in his words, as scapegoats or fall guys, and I wanted some record that this had occurred.

Q. Mr. Horowitz, when you refer to having done things that were wrong, what are you referring to?

A. We inflated our revenues to hit quarterly numbers, and we didn't tell our finance team about it. We didn't tell our legal team about it. We dragged out the payments so that way, at the end of the third quarter, we had over $11 million of revenue that was owed back to a partner that was not properly accounted for. And we would lie in our response to the SEC because we left out material terms on why those prices increased.

Q. Let's talk about that. We saw the letter that came in December from the SEC. Was that the last letter that the

LA7PCOL6    Horowitz - Direct    Page 356

company received from the SEC?

A. No, it was not.

Q. What was the next one that you knew about, and when did it come?

A. I believe it came in February.

Q. Of 2015?

A. Of 2015.

Q. Mr. Charalambous, can you please show for the witness and the parties what's been marked as Government Exhibit 112. Mr. Horowitz, is this the letter that came from the SEC in February of 2015?

A. It is.

MR. HARTMAN: The government offers Government Exhibit 112.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 112 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, what's the date of this letter?

A. February 11th, 2015.

Q. Can we go to page 2, please, Mr. Charalambous. Mr. Horowitz, could I ask you to read paragraph 2 here, please?

A. Starting at "Explain"?

Q. Actually, let's start with, "Please further explain," which

LA7PCOL6    Horowitz - Direct    Page 357

is in the middle of that top paragraph.

A. "Please further explain to us the primary business purpose of the (1) initial formations of your international joint ventures between 2012 and 2014; (2) subsequent sales of your wholly owned trademarks in certain international locations to existing joint ventures or licensees (December 2013, June and September 2014); and (3) sale of your controlling interest in OP Japan to your joint venture partner in December 2012."

Q. Let's stop right there. Mr. Horowitz, did you have an understanding at this point of what it was that the SEC was concerned about with respect to these joint ventures?

A. Yes.

Q. What's your understanding of what they were concerned about?

A. Well, my understanding in how it was explained and discussed internally at Iconix, was that these joint ventures were counted as revenue for the company, and there are questions as to whether or not the structure, the actual structure or formation of these joint ventures, were properly accounted for as revenue.

And there was also a great focus on the puts and calls or the ability for the partner to force Iconix to buy back 50 percent after five years, or Iconix's ability to buy back the 50 percent after five years.

Q. To your understanding at this point, had the SEC identified